<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 98-1589

                          A.J. FAIGIN,

                     Plaintiff, Appellant,

                               v.

                JAMES E. KELLY AND VIC CARUCCI,

                     Defendants, Appellees.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF NEW HAMPSHIRE

        [Hon. Shane Devine, Senior U.S. District Judge]

                             Before

                   Selya, Boudin and Lipez,
                                
                       Circuit Judges.
                                
                                
                                
    A.J. Faigin, pro se ipso, for appellant.
    Steven M. Gordon, with whom Lucy J. Karl, Shaheen & Gordon,
P.A., and Linda Steinman were on brief, for appellee Kelly.

July 19, 1999

                                
                                

 SELYA, Circuit Judge.  This is a tale of an American
icon.  Jim Kelly attained great celebrity during an illustrious
professional football career.  By his own admission, however, he
did not handle his newfound fame and fortune as well as he handled
a pigskin.  Looking back, Kelly believed that his adjustment had
been retarded by a cluster of agents who put their own financial
interests ahead of his.
 Eventually, Kelly rid himself of these subalterns and
made different arrangements.  When he thereafter penned his
autobiography, he made no bones about his contempt for his former
mentors.  One of these advisers, plaintiff-appellant A.J. Faigin,
took umbrage and sued both Kelly and Vic Carucci, the journalist
who assisted Kelly in writing the book.  In due season, the nisi
prius court granted Carucci's motion for summary judgment, but
denied Kelly's parallel motion.  Faigin's case against Kelly was
tried to a jury over a 19-day span and resulted in a defendant's
verdict.  Faigin appeals.  Deterrating no reversible error, we
affirm.
I.  BACKGROUND
 We divide our canvass of background events into three
segments.  First, we sketch the contours of the association between
Kelly and Faigin.  Next, we discuss the book that Kelly wrote with
Carucci's help.  Third, we limn the travel of the case.

                     A.  The Relationship.
 In 1980, Faigin joined Greg Lustig and Ken Weinberger in
forming what they conceived as a "full-service sports management"
enterprise.  This mini-conglomerate included three separate
corporations that collectively offered tax, accounting, financial,
and marketing services to professional athletes.  Although these
entities seemingly overlapped in practice, the founders' game plan
was to furnish contract negotiation services through Lustig Pro
Sports, Inc. (LPS); to furnish financial and investment advice
through Consultants' Development Group, Inc. (CDG); and to use the
third entity, known as Lustig Group (L-Group), as an investment
vehicle.  Lustig and Faigin also formed a law firm, Lustig & Faigin
Co., LPA (L&F), to provide legal representation to athletes and to
the three corporations.  Faigin had an interest in each of these
entities:  he had capital invested in LPS and served as its
president; he was a shareholder, director, and officer of both CDG
and L-Group; and he a was a principal in L & F.
 In 1983, Kelly capped a star-studded collegiate career as
the quarterback of the University of Miami Hurricanes.  Faigin
recruited him that spring and Kelly signed contracts with LPS and
CDG.  Both the National Football League (the NFL) and the United
States Football League (the USFL) drafted him in the first round.  
Kelly opted for the fledgling USFL.  LPS negotiated a contract for
him with the Houston Gamblers and CDG assembled and managed his
investment portfolio.  After the USFL folded in 1986, LPS helped
Kelly secure a contract with the Buffalo Bills of the NFL   a deal
that, at the time, was thought to be the most lucrative in the
league's history.
 In 1987, Faigin and Lustig came to a rancorous parting of
the ways.  Faigin sent Kelly an audiotape describing the split and
explaining that he no longer could work with Lustig because he
feared for his own reputation.  In this regard, Faigin noted that
Lustig's investment advice and other business decisions were
largely self-serving, and that LPS's clients, Kelly included, had
been improperly billed.  Kelly's investigation into these charges
lent him no comfort and, in 1988, he severed his ties with his
former agents.  A new set of advisers took the helm.
                         B.  The Book.
 Carucci agreed to help Kelly write his autobiography, and
the tome, entitled "Armed and Dangerous," was published in 1992.  
For the most part, the account (written in the first-person
singular, despite Carucci's collaboration) lumped Faigin, Lustig,
and Weinberger together.  The passages relating to them were
relatively brief.   We reprint below the statements that sparked
the instant action:
     The draft began at eight o'clock in the
 morning.  I was in Akron, Ohio, where my
 agents at the time   Greg Lustig, A.J. Faigin
 and Ken Weinberger   were based.  (I wanted to
 use another word besides "agents" here, but
 that's better left for the lawsuit that is
 currently pending in Texas.  My mother always
 said if you don't have anything good to say
 about somebody, don't say anything at all.)

               *        *        *

     I learned my lesson the hard way about
 whom to trust and whom not to trust in
 business.  I had had complete faith in my
 first agents, Greg Lustig and A.J. Faigin. . .
 .

     Then Danny and the Trevino brothers
 started taking a closer look at my business
 affairs.  And the more they looked, the more
 they didn't like what they found.

     Finally, I saw the light.  In 1988, I
 fired Lustig and Faigin and put my brother
 [Danny] and the Trevinos in charge of all my
 business dealings.  Then I filed a major
 lawsuit against my former agents, as well as
 the former owners of the Gamblers for
 defaulting on the payment of my signing bonus.

     Fortunately, I was able to catch the
 problem before it was too late, which made me
 luckier than a lot of other pro athletes.  
 When you come out of college, you're so
 trusting, so vulnerable when it comes to
 finding people to handle your money.  I'm just
 glad that I had a brother and a couple of
 close friends who cared enough to slap me
 upside the head and get my attention.

     The funny thing is, my mother never
 liked Lustig from Day One.  There was
 something about him that told her he couldn't
 be trusted.

     I should have followed Mom's intuition.

Jim Kelly and Vic Carucci, Armed and Dangerous 57, 159-60 (1992).

                    C.  Travel of the Case.
 Invoking diversity jurisdiction, 28 U.S.C.  1332(a),
Faigin initiated a libel action against Kelly and Carucci in New
Hampshire's federal district court.  Extensive pretrial discovery
ensued.  In the course of the proceedings, the district court, for
reasons to which we shall return, granted summary judgment in
Carucci's favor.
 Faigin's case against Kelly was tried to a jury.  The
court permitted Kelly and Faigin to argue competing views of the
gist of the disputed passages.  For his part, Kelly maintained both
that his comments were not defamatory (but indicated merely that he
had "lost trust in his agents generally") and that they were true.  
Faigin disagreed.  He argued that the statements falsely implied
that he was dismissed for unlawful conduct, thus damaging his
reputation and jeopardizing his career.  The court submitted the
case on special interrogatories.  See Fed. R. Civ. P. 49(a).  In
response to the first question, the jury concluded that the
relevant passages contained defamatory statements, i.e.
implications of fact that tended to harm Faigin's reputation.
 The second question went to the statements' objective
truth.  It read:  "Based on a preponderance of the evidence, do you
find that the defamatory statements or implications of fact in the
defendant's book were false?"  The jury found that Faigin had
failed to prove falsity and, pursuant to the court's instructions,
returned a take-nothing verdict.
 This appeal followed.  Faigin, who was represented by
experienced counsel below, proceeds pro se in this court.  He
assigns error to a plethora of rulings.  Many of his arguments so
clearly lack persuasive force that we reject them out of hand.  In
this opinion, we examine only the residuum of Faigin's
asseverational array.
II.  ANALYSIS
 We start our trek through the issues by scrutinizing the
summary judgment ruling.  Moving to the trial, we next consider
Faigin's sufficiency-of-the-evidence challenge and his insistence
that the district court improperly declined to apply collateral
estoppel to his behoof.  We then survey a number of evidentiary
issues and proceed from there to ponder an alleged discovery
violation and the lower court's denial of Faigin's request to mount
a rebuttal.  We conclude by addressing the jury instructions.
               A.  The Entry of Summary Judgment.
 Faigin asserts that the trial court erred in granting
Carucci an exit visa under the aegis of Fed. R. Civ. P. 56.  See,
e.g., Garside v. Osco Drug, Inc., 895 F.2d 46, 48-49 (1st Cir.
1990) (explicating summary judgment standard).  We explain briefly
why we regard this assertion as moot.
 In this diversity case, New Hampshire law supplies the
substantive rules of decision.  See Fitzgerald v. Expressway
Sewerage Constr., Inc., ___ F.3d ___, ___ (1st Cir. 1999) [No. 98-
1473, slip op. at 5]; Blinzler v. Marriott Int'l, Inc., 81 F.3d
1148, 1151 (1st Cir. 1996).  To prove defamation under New
Hampshire law, a plaintiff ordinarily must establish that the
"defendant failed to exercise reasonable care in publishing,
without a valid privilege, a false and defamatory statement of fact
about the plaintiff to a third party."  Independent Mechanical
Contractors, Inc. v. Gordon T. Burke & Sons, Inc., 635 A.2d 487,
492 (N.H. 1993), citing Restatement (Second) of Torts  558 (1977).  
A statement is defamatory if "it tends so to harm the reputation of
another as to lower him in the estimation of the community or to
deter third persons from associating or dealing with him."  
Restatement (Second) of Torts  559 (1977).  Consequently, a libel
plaintiff customarily bears the burden of proving that the
defendant (1) lacked due care (2) in publishing a false statement
of fact (3) which was defamatory in nature.
 Most rules admit of exceptions, and this rule is no
different.  The Supreme Court has made it pellucid that the First
Amendment demands that a defamation plaintiff who is a "public
figure" must show more than mere negligence.  See Masson v. New
Yorker Magazine, Inc., 501 U.S. 496, 510 (1991); New York Times Co.
v. Sullivan, 376 U.S. 254, 283 (1964).  Rather, as a condition
precedent to recovery, such a plaintiff must prove by clear and
convincing evidence that the defendant published the defamatory
statement with actual malice, that is, that the defendant knew that
the statement was false or, at least, recklessly disregarded its
want of veracity.  See Masson, 501 U.S. at 510; Pendleton v. City
of Haverhill, 156 F.3d 57, 65 (1st Cir. 1998).
 In this case, the district court concluded that Faigin
was a limited-purpose public figure.  See Faigin v. Kelly, 978 F.
Supp. 420, 428 (D.N.H. 1997).  This meant that Faigin had the
responsibility of proving actual malice in order to recover for
defamation.  See id. at 428-29.  Because Faigin had adduced no
evidence that Carucci (who functioned principally as a scrivener)
either knew that the challenged statements were false or recklessly
disregarded their truthfulness, see id. at 429, the district court
granted Carucci's motion for brevis disposition.
 In this venue, Faigin maintains that the trial court
erred in characterizing him as a limited-purpose public figure.  
The argument that he presents is substantial, and the answer to the
question is not free from doubt.  In the last analysis, however, we
have no occasion to probe the point.
 At trial, the jury found specially that Faigin did not
prove that the allegedly defamatory statements were false.  
Objective falsity is not only an element of a defamation action,
but also is logically antecedent to questions bearing upon
negligence or state of mind.  Thus, this special finding, which we
conclude was supportable, see infra Part II(B), itself sufficed to
thwart Faigin's lawsuit and rendered the presence or absence of
malice irrelevant.  See Restatement (Second) of Torts  581A,
comment h (1977) (explaining that "it is immaterial if the person
who publishes the statement believes it is false if it turns out to
be true").  It follows inexorably that, inasmuch as Faigin's status
as a public figure vel non bore exclusively on the state-of-mind
requirement, the jury's finding on falsity moots the public figure
inquiry.
                B.  Sufficiency of the Evidence.
 Faigin contends that the evidence adduced at trial was
insufficient as a matter of law to sustain the verdict.  The
principal problem with this contention is that Faigin neglected to
make a motion for judgment as a matter of law at the close of all
the evidence.  See Fed. R. Civ. P. 50(a).  He then compounded his
lapse by abjuring any motion for judgment notwithstanding the
verdict.  See Fed. R. Civ. P. 50(b).  When a litigant has foregone
a timely motion for judgment as a matter of law, the court of
appeals normally will not consider the legal sufficiency of the
evidence.  See Hammond v. T.J. Litle & Co., 82 F.3d 1166, 1171 (1st
Cir. 1996); La Amiga del Pueblo, Inc. v. Robles, 937 F.2d 689, 691
(1st Cir. 1991); Jusino v. Zayas, 875 F.2d 986, 991 (1st Cir.
1989).
 We say "normally" because, even in the absence of such a
motion, the court of appeals retains a modicum of residual
discretion to inquire whether the record reflects an absolute
dearth of evidentiary support for the jury's verdict.  See La Amiga
del Pueblo, 937 F.2d at 691.  Here, however, such an inquiry
quickly reveals that the evidence is not so lopsided as to bring
this seldom-invoked discretion into play.  To the contrary, the
evidence that contradicts Faigin's claim of objective falsity seems
more than ample.
 We add a coda.  To the extent that Faigin contends that
the verdict was against the weight of the evidence, his failure to
file a motion for new trial, see Fed. R. Civ. P. 59(a), ensnares
him in the toils of a similar   and equally lethal   procedural
default.  See La Amiga del Pueblo, 937 F.2d at 691 (explaining that
if the verdict-loser has not made a timely motion for a new trial,
"the court of appeals will not thereafter review the weight of the
evidence undergirding the adverse verdict").
                    C.  Collateral Estoppel.
 Faigin complains bitterly about the district court's
refusal to give preclusive effect to a sanctions order issued in
the aftermath of previous litigation between the protagonists.  We
set the stage.
 In 1989, Kelly sued Lustig, Faigin, Weinberger, and
numerous others in the United States District Court for the
Southern District of Texas.  As it pertained to Faigin, the
complaint alleged in substance that he had played an active role in
misleading Kelly about certain investments.  Kelly settled some
claims against some defendants and dropped other defendants because
of their penury.
 In 1994, under pressure to comply with long-overdue
discovery requests, he voluntarily dismissed his claims against
Faigin without prejudice.  Faigin then moved for sanctions,
claiming that Kelly had knowingly brought and maintained a
groundless case against him without performing the investigation
required under Fed. R. Civ. P. 11.  The Texas court found that
Kelly had adduced no evidence to show that Faigin was involved in
the investment decisions that formed the centerpiece of the
litigation; determined that Kelly knew (or should have known) that
his allegations against Faigin were therefore frivolous; and
ordered  Kelly to pay $11,000 in sanctions.  See  Kelly v. Lustig,
No. H-89-1931, slip op. (S.D. Tex. Aug. 12, 1994) (the Sanctions
Order).
 After he had initiated the instant case, Faigin asked the
district court to treat the Sanctions Order as conclusive evidence
that Kelly knew the statements made in Armed and Dangerous were
false vis--vis Faigin.  The court denied Faigin's motion in limine
and rejected similar importunings during the trial.  Faigin
protests.
 Fundamentally, this claim of error suffers from the same
infirmity as Faigin's "public figure" argument.  See supra Part
II(A).  The jury found that Faigin had failed to prove that the
challenged passages were false   and Faigin did not claim below
(nor does he claim on appeal) that the Sanctions Order should have
been given preclusive effect on the issue of objective falsity.  
Thus, technically, Faigin's collateral estoppel argument   which
went only to the issue of Kelly's state of mind   was rendered moot
by the jury's special finding on the logically antecedent issue of
falsity.
 Despite this conclusion, we deem it advisable to treat
the collateral estoppel issue on the merits.  We do so because
Faigin also assails the district court's refusal to admit the
Sanctions Order into evidence at all.  See infra Part II(D).  That
claim is far from moot (as Faigin argues, inter alia, that the
Sanctions Order, though not preemptive, constitutes a salient piece
of evidence on the issue of objective falsity), and our resolution
of this evidentiary ruling is necessarily informed by a
determination of whether the trial court erred in its assessment of
the collateral estoppel initiative.  Hence, we inquire into the
court's decision not to give the Sanctions Order preclusive effect.  
Since applications of the collateral estoppel doctrine primarily
present questions of law, we afford de novo review.  See Keystone
Shipping Co. v. New Engl. Power Co., 109 F.3d 46, 50 (1st Cir.
1997).
 When a party implores a federal court to give preclusive
effect to a prior federal court adjudication, federal law governs.  
See Massachusetts Sch. of Law v. ABA, 142 F.3d 26, 37 (1st Cir.
1998); Johnson v. SCA Disposal Servs. of New Engl., Inc., 931 F.2d
970, 974 (1st Cir. 1991).  Faigin argues here for issue preclusion
as opposed to claim preclusion.  See, e.g., Fiumara v. Fireman's
Fund Ins. Cos., 746 F.2d 87, 90 n.1 (1st Cir. 1984) (remarking the
separate existence of the two distinct, but closely related,
doctrines).  Under federal common law, a party seeking to estop the
litigation of an issue by reference to a previous adjudication
between the parties must establish (1) an identity of issues (that
is, that the issue sought to be precluded is the same as that which
was involved in the prior proceeding), (2) actuality of litigation
(that is, that the point was actually litigated in the earlier
proceeding), (3) finality of the earlier resolution (that is, that
the issue was determined by a valid and binding final judgment or
order), and (4) the centrality of the adjudication (that is, that
the determination of the issue in the prior proceeding was
essential to the final judgment or order).  See Grella v. Salem
Five Cent Savings Bank, 42 F.3d 26, 30 (1st Cir. 1994); NLRB v.
Donna-Lee Sportswear Co., 836 F.2d 31, 34 (1st Cir. 1987); see also
Restatement (Second) of Judgments  27 (1982).  Faigin's proffer
cannot clear either the first or second of these hurdles.
 It is common ground that the reach of collateral estoppel
"must be confined to situations where the matter raised in the
second suit is identical in all respects with that decided in the
first proceeding."  IRS v. Sunnen, 333 U.S. 591, 599-600 (1948).  
The issue addressed and resolved by the Sanctions Order was whether
Kelly had abused the judicial process in failing to produce
evidence to substantiate claims that he had made regarding Faigin's
supposed involvement in shady investment activities.  By contrast,
the issue below was the truthfulness vel non of the remarks
contained in Kelly's autobiography.  The latter implicated Kelly's
overall relationship with his agents and dealt with a much broader
spectrum of business practices.  Moreover, while the narrower
charges leveled by Kelly in the Texas case overlapped to some
modest extent with the matters at issue in the instant case, the
mere presence of a modicum of factual commonality does not
establish the requisite identity of issues for purposes of
collateral estoppel.  See id. at 601.  Rather, the issues must be
defined by reference to the judicial determinations at stake.  See
id. at 600.
 Given the Sunnen standard, there is simply too loose a
fit to warrant a collateral estoppel here.  At issue in the Rule 11
proceedings was Kelly's litigation conduct; at issue below was the
truth of the factual implications contained in the book.  Because
the issues are not the same, the district court correctly refused
to give the Sanctions Order preclusive effect.  See Thomas v.
Contoocook Valley Sch. Dist., 150 F.3d 31, 41 (1st Cir. 1998)
(rejecting collateral estoppel due to a lack of issue
identicality).
 There is a second, equally compelling basis for rebuffing
the collateral estoppel idea.  The scope of a Rule 11 hearing is
generally much more circumscribed than that of a trial or
comparable proceeding.  Thus, there are legitimate questions as to
whether a Rule 11 sanctions order can provide a satisfactory basis
for issue preclusion under any circumstances in respect to the
merits of a complaint.  See Amwest Mortgage Corp. v. Grady, 925
F.2d 1162, 1165 (9th Cir. 1991); see also Cooter & Gell v. Hartmarx
Corp., 496 U.S. 384, 396 (1990) (warning that "[e]ven if a district
court indicated that a complaint was not legally tenable or
factually well-founded for Rule 11 purposes, the resulting Rule 11
sanction would nevertheless not preclude the refiling of a
complaint").  By their very nature, Rule 11 inquiries are severely
restricted, see Fed. R. Civ. P. 11 advisory committee notes
(explaining that "the court must to the extent possible limit the
scope of sanction proceedings to the record"), and it seems odd to
extrapolate from them to the subsequent litigation of issues on the
merits.
 Whether or not findings made in a Rule 11 proceeding can
ever be given collateral estoppel effect as to the merits of a
complaint at a subsequent trial   a matter that we leave for
another day   the Sanctions Order upon which Faigin relies misses
the mark.  Faigin brought his Rule 11 motion based on Kelly's
ostensible failure adequately to investigate the facts and the law
prior to filing the Texas civil action.  See Fed. R. Civ. P.
11(b)(2)-(3).  The Texas court had no obligation to conduct a
searching inquiry into the truth or falsity of Kelly's allegations,
and it did not do so.  Rather, the court concerned itself solely
with whether Kelly had made the pre-filing investigation that Rule
11 demands   and it did so on a record essentially devoid of
discovery.  While we do not question the propriety of the sanction  
 the fact that Kelly had maintained an action against Faigin for
five years without ever producing evidence in support of his claims
appears inexcusable   we discern no sufficient indicia that the
issues which are determinative here actually were litigated in the
Rule 11 proceeding.
 We need not paint the lily.  Either of the reasons we
have stated is independently sufficient to justify the district
court's refusal to apply principles of collateral estoppel in this
situation.  Together, they are insurmountable.

           D.  Admissibility of the Sanctions Order.
 Apart from collateral estoppel on the issue of knowledge,
Faigin sought to introduce the Sanctions Order into evidence as
probative on the issue of falsity.  Kelly countered by invoking
Fed. R. Evid. 403 and moving in limine to bar any reference to the
Sanctions Order for this purpose.  The court proceeded cautiously.  
It took Kelly's motion under advisement, alerting the parties that
it needed a more complete picture of the evidence in order
adequately to assess the question of admissibility.  See United
States v. Holmquist, 36 F.3d 154, 163 (1st Cir. 1994) (endorsing
such an approach).  The court indicated that it would perform the
requisite balancing when the issue surfaced in a better-defined
context.
 On several occasions during the trial, Faigin attempted
to introduce the Sanctions Order (or evidence about it).  Each
time, the district court rejected the proffer.  Faigin condemns the
exclusion of this evidence.  We test the trial court's rulings on
claims of error related to the admission or exclusion of evidence
for abuse of discretion.  See Williams v. Drake, 146 F.3d 44, 47
(1st Cir. 1998); Blinzler, 81 F.3d at 1158.
 Under Rule 403, the trier must balance probative worth
against unfairly prejudicial effect.  We accord district courts
considerable latitude in this exercise.  Trials are highly nuanced
affairs, and we are mindful that the trial judge   unlike an
appellate panel   can hear the gunfire, observe the maneuvering,
and smell the smoke of battle as the case plays out before the
jury.
 In this instance, the disputed evidence had some
probative value.  Kelly and Faigin argued competing views of the
gist of the challenged statements, and the findings in the
Sanctions Order tend to corroborate Faigin's claim that these
passages contained false implications of fact.  But the probative
value of these findings was not great.  As previously noted, the
issues addressed in the two fora varied significantly.  For
example, in support of his "substantial truth" defense, Kelly
produced evidence below of improper overbilling, fiduciary failings
related to his USFL contract, a gossamer insurance policy, a
fraudulent assignment, and questionable tax advice involving the
backdating of checks.  None of these items had surfaced in the
Texas litigation, and, therefore, the Sanctions Order had scant
probative value as to the accuracy of those allegations.
 To be sure, a subset of overlapping allegations existed.  
As to these issues, the Texas court's frivolousness finding had
some limited value.  Still, the matter had not been fully litigated
and the finding stemmed from an undeveloped record.  See supra Part
II(C).  Moreover, the finding was made pursuant to a legal standard
very different from objective falsity.  See id.  The finding
therefore carried diminished probative value even as to the
overlapping issues.
 Looking at the other pan of the scales, the district
court had solid reasons for concern about the untoward effects of
the proffered evidence.  A lay jury is quite likely to give special
weight to judicial findings merely because they are judicial
findings.  See Nipper v. Snipes, 7 F.3d 415, 418 (4th Cir. 1993)
(explaining that "judicial findings of fact present a rare case
where, by virtue of their having been made by a judge, they would
likely be given undue weight by the jury") (internal quotations
marks omitted).  Consequently, courts, recognizing the attendant
danger of jury confusion and unfair prejudice, frequently have
approved the exclusion of judicial findings, convictions, and
similar evidence on Rule 403 grounds.  See, e.g.,  Gil de Rebollo
v. Miami Heat Assocs., Inc., 137 F.3d 56, 64 (1st Cir. 1998)
(upholding decision to exclude evidence of a criminal misdemeanor
conviction in a related civil trial); Nipper, 7 F.3d at 418
(upholding exclusion of court order in related civil case); cf.
Williams, 146 F.3d at 47 (affirming, in a related civil suit,
exclusion of guilty plea previously entered by plaintiff before
prison disciplinary board).  We are extremely reluctant to second-
guess the district court's battlefield determination that the
scenario at hand presented a worrisome potential for such mischief.
 Our task on appeal is not to conduct afresh the balancing
that Rule 403 requires.  Instead, we review the record to determine
whether the trial court's calibration of the probative value/unfair
prejudice scales falls within the range of acceptable outcomes.  
Our review indicates that the court below held the balance steady
and true:  it excluded the Sanctions Order but permitted Faigin to
show Kelly's course of conduct in the prior litigation and to argue
to the jury that this behavior demonstrated his bad faith (or
worse).  Rule 403 controversies by their very nature present
competing considerations, and compromise is often the best solution
for a particularly knotty Rule 403 problem.  See, e.g., Williams,
146 F.3d at 47 (deeming it important that the court excluded only
the guilty plea, not evidence of the prior disciplinary proceedings
in gross).  We think that the district court's charting of such a
course made good sense in the idiosyncratic circumstances of this
case.
 In the end, the standard of review carries the day.  We
have said with a regularity bordering on the monotonous that
"[o]nly rarely   and in extraordinarily compelling circumstances   
will we, from the vista of a cold appellate record, reverse a
district court's on-the-spot judgment concerning the relative
weighing of probative value and unfair effect."  Freeman v. Package
Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988).  This case, in
which the district court maximized the evidence available to the
jury while simultaneously minimizing the potential for confusion
and unfair prejudice, comes within the Freeman rule.  Because no
"extraordinarily compelling circumstances" counsel to the contrary,
we hold that the lower court did not abuse its discretion in
excluding Faigin's proffer of the Sanctions Order.
                 E.  Other Evidentiary Points.
 Faigin offers a salmagundi of other tidbits relating to
the admission and/or exclusion of evidence.  We comment briefly on
each of these contentions.  The benchmark for our review remains
abuse of discretion.  See Williams, 146 F.3d at 47; Blinzler, 81
F.3d at 1158.
 1.  Vicarious Liability.  Faigin unsuccessfully moved in
limine to prohibit Kelly from introducing evidence on what Faigin
characterizes (somewhat inaccurately, in our view) as a theory of
"vicarious liability."  He now protests the district court's denial
of his motion, maintaining that the charged defamation was
"personal" and that Kelly should not have been allowed to shift the
focus from Faigin as an individual by presenting evidence of
Faigin's partners' skullduggery (a practice that Faigin, in
phraseology that sheds more heat than light, calls "guilt by
association").  This argument lacks force.
 At trial, Kelly maintained that his statements about
Faigin connoted nothing more than an overall loss of trust in his
former agents.  In support of that theory, he sought to depict a
mosaic of misconduct allegedly perpetrated by LPS, CDG, L-Group,
and their representatives (like Lustig).  Considering Faigin's ties
to this contingent and his fiduciary responsibilities as an
attorney, a principal, and a corporate officer, this evidence
possessed palpable relevancy.  See Fed. R. Evid. 401, 402.  The
evidence also possessed relevancy as a means of painting the
backdrop against which Kelly's affairs were handled and his book
written.  We view it as well-settled that "context" evidence
generally is admissible, see, e.g., United States v. McKeeve, 131
F.3d 1, 13-14 (1st Cir. 1997), and there is no warrant for applying
some other, more restrictive rule here.  The district court thus
acted within the bounds of its discretion in permitting Kelly to
introduce evidence of the dubious practices in which his advisers
engaged, whether or not Faigin personally committed them.
 2.  Judicial Estoppel.  Faigin also suggests that this
same evidence should have been barred under the doctrine of
judicial estoppel.  His refrain goes something like this:  in the
Texas litigation, Kelly claimed that the corporations were Lustig's
alter egos, and, therefore, Kelly should have been prohibited from
asserting in this case that Faigin played a meaningful role in
their operation.  We disagree.
 Under certain circumstances, the doctrine of judicial
estoppel precludes "parties in civil litigation from asserting
legal or factual positions inconsistent with the positions that
they took in prior proceedings."  United States v. Velez Carrero,
140 F.3d 327, 330 (1st Cir. 1998).  To invoke the doctrine, the
proponent must show that the party to be estopped had "succeeded
previously with a position directly inconsistent with the one [he]
currently espouses."  Lydon v. Boston Sand & Gravel Co., 175 F.3d
6, 13 (1st Cir. 1999).  Passing the obvious fact that the positions
taken by Kelly in the two cases are hardly susceptible to
characterization as "directly inconsistent," Faigin made no showing
that Kelly succeeded in establishing his earlier position.  To the
contrary, Kelly eventually dropped the veil-piercing claims that he
had asserted against Lustig and the myriad corporate entities.  
Hence, Faigin lacks any plausible basis for a claim of judicial
estoppel.
 3.  Kickback Evidence.  Land, Sea & Air Development
Corporation (LS&A) owned certain area rights to a restaurant
franchise.  In 1984, it contracted with L-Group to have the latter
"package, syndicate, and secure all necessary funding" for these
franchises.  In return, LS&A agreed to remunerate L-Group by paying
commissions and making other scheduled payments as particular
franchise locations were developed.
 Kelly asserted at trial that his agents steered clients'
funds into certain of these franchises without advising the clients
of L-Group's arrangement with LS&A.  He asked the district court to
admit into evidence the memorandum of understanding (MOU) entered
into between LS&A and L-Group as part of his effort to show that L-
Group's financial interest in these projects had not been fully
disclosed in the offering materials that the agents presented to
clients (Kelly included).  The district court admitted the MOU over
Faigin's objection.
 On appeal, Faigin contends that admitting the evidence
and allowing Kelly to refer to it as evidence of a "kickback"
scheme created unfair prejudice.  See Fed. R. Evid. 403.  We reject
this contention.  Faigin, an officer and director of L-Group, was
privy to the MOU   indeed, he had subscribed his name as a witness
to Lustig's execution of it   and the document, when taken in
conjunction with other properly admitted materials, constituted
relevant evidence of a blatant conflict of interest.
 To be sure, the evidence was prejudicial in the sense
that it hurt Faigin's chances of prevailing at trial.  But that
kind of prejudice is not a basis for judicial exclusion of
probative evidence.  All evidence introduced by a party is designed
to be prejudicial   to help his case, or to harm his opponent's
case, or both.  Thus, "[t]he fact that a piece of evidence hurts a
party's chances does not mean it should automatically be excluded.  
If that were true, there would be precious little left in the way
of probative evidence in any case."  Onujiogu v. United States, 817
F.2d 3, 6 (1st Cir. 1987).  The question is one of unfair prejudice
 and we see none here.
 Faigin's complaint about the characterization of the MOU
as evidence of a "kickback" rather than a "sales commission" is
unavailing.  He never specifically objected below to the use of the
word, and, thus, has forfeited the point.  See Campos-Orrego v.
Rivera, 175 F.3d 89, 95 (1st Cir. 1999); Teamsters, Chauffeurs,
Warehousemen and Helpers Union v. Superline Transp. Co., 953 F.2d
17, 21 (1st Cir. 1992).  Of course, we still could intervene to
correct plain error, forfeiture notwithstanding   but plain error
is plainly absent in this instance.  Although the word "kickback"
is pejorative, trials are flesh-and-blood affairs.  Courts
routinely grant lawyers and litigants some margin for rhetorical
flourishes.  See generally Wagenmann v. Adams, 829 F.2d 196, 217
(1st Cir. 1987) ("Our judicial system is not so impractical as to
demand that the last drop of juice be squeezed from evidence before
a jury can consider it.").  Here, the court permitted the parties
to explore the MOU's ramifications and characterize it as they
preferred, leaving the jury to decide whether the arrangement more
closely resembled a straightforward sales commission or something
less savory.  While calling the arrangement a kickback was strong
medicine (and perhaps better left unsaid), it strains credulity to
suggest, in the absence of a specific objection, that the use of
the word caused justice to miscarry.  See Campos-Orrego, 175 F.3d
at 95 (finding "no patent injustice . . . in holding the
appellant[] to the readily foreseeable consequences of [his] own
trial tactics," and, accordingly, finding no plain error).
 4.  Former Clients.  During the trial, the district court
permitted four former clients of LPS to testify.  Faigin contends
generally that this evidence was erroneously admitted.  However, he
failed to make sufficiently specific contemporaneous objections
when the witnesses were called to testify, thus negating the
contention that he seeks to advance here.  See United States v.
Saccoccia, 58 F.3d 754, 780 (1st Cir. 1995); see also Fed. R. Evid.
103(a).
 Relatedly, Faigin complains about the introduction of
evidence of other lawsuits brought by former clients against
Lustig, LPS, CDG, and/or L-Group.  While we doubt that this
complaint has been properly preserved, we do not doubt that it   
like the claim related to the testimony of the former clients   is
meritless.  Testimony by other athletes regarding their
difficulties with Faigin and his associates went directly to the
truth of the disputed statements contained in Kelly's
autobiography.  Similarly, evidence of other lawsuits   whether or
not they named Faigin as a defendant   was probative to impeach
Faigin's claimed ignorance of any corporate misconduct.  Then, too,
much of this evidence was relevant to damages, specifically, the
state of Faigin's reputation prior to the publication of Armed and
Dangerous.  See Bularz v. Prudential Ins. Co., 93 F.3d 372, 378-79
(7th Cir. 1996) (finding evidence of complaints by other customers
relevant both to the truth of the allegedly defamatory statement
and to the pre-publication state of the plaintiff's reputation).
 To say more on this front would be supererogatory.  
Bearing in mind that "[a] trial is a search for truth and cannot
sensibly take place in a vacuum," Real v. Hogan, 828 F.2d 58, 62
(1st Cir. 1987), we reject the entire alphabet of evidentiary error
that Faigin marshals.
 F.  The Alleged Discovery Violation.
 Faigin propounded interrogatories concerning Kelly's
investments over a 13-year span.  Kelly inventoried his
investments, but was less forthcoming in respect to two ancillary
interrogatories.  One of these asked him to specify, for each such
investment, "the amount of money that the investment has made or
lost from the inception to date, and, if sold, identify the date of
sale."  The other requested (a) that he acknowledge, in regard to
each poor performer, "whether [he] received a tax deduction for the
loss," and (b) that he confirm "the total sum of [all such] tax
deductions."  When compelled to answer these two interrogatories,
Kelly replied that "[t]he financial data required to respond . . .
is not readily available."  He then referred Faigin to particular
financial schedules and statements previously produced and
represented that these "statements reflect the value of [Kelly's]
holdings as of the dates thereof."  Finally, he explained that,
because of a confidentiality agreement imposed by an arbitrator, he
could not furnish information with regard to investments that he
had made through Shearson Lehman Brothers.  Faigin made no further
effort to compel more particularized answers to these two
interrogatories.
 At trial, Faigin labored to exclude evidence that
numerous investments arranged for Kelly by CDG and L-Group proved
worthless.  To support this entreaty, Faigin cited the
incompleteness of Kelly's answers to the two ancillary
interrogatories and asked the district court to invoke its powers
under Fed. R. Civ. P. 37(b)(2).  The court refused to rule out the
evidence of investment losses and Kelly introduced it.  Faigin
assigns error.
 A district court's case-management powers apply with
particular force to the regulation of discovery and the
reconciliation of discovery disputes.  See Daigle v. Maine Med.
Ctr., Inc., 14 F.3d 684, 692 (1st Cir. 1994); Mack v. Great Atl. &
Pac. Tea Co., 871 F.2d 179, 186 (1st Cir. 1989); In re Recticel
Foam Corp., 859 F.2d 1000, 1006 (1st Cir. 1988).  The standard of
review in discovery matters is not appellant-friendly.  The court
of appeals "will intervene in such matters only upon a clear
showing of manifest injustice, that is, where the lower court's
discovery order was plainly wrong and resulted in substantial
prejudice to the aggrieved party."  Mack, 871 F.2d at 186.
 In this instance, the trial court heard arguments as to
whether the interrogatory answers complied with the order
compelling further responses.  Ultimately, the court ruled in
Kelly's favor, implicitly determining (as had been argued) that
Kelly had substantially complied with the order and that in all
events Faigin had accumulated sufficient information to contest the
claimed losses.  Having carefully reviewed the record, we deem this
two-part ruling supportable.
 We start with two general propositions of indisputable
validity.  First,  the question whether a party adequately has
complied with a court order is a matter peculiarly within the ken
of the judge who issued the order.  See De Leon Lopez v.
Corporacion Insular de Seguros, 931 F.2d 116, 120 n.3 (1st Cir.
1991) ("A district court, after all, is in the best position to
determine whether a party's filings are sufficient to comply with
the court's own order."); Martha's Vineyard Scuba Headquarters,
Inc. v. Unidentified, Wrecked and Abandoned Steam Vessel, 833 F.2d
1059, 1066-67 (1st Cir. 1987) (similar).  Second, answering
interrogatories is more a matter of art than of science.  Thus, the
sufficiency of an answer to an interrogatory frequently depends on
the surrounding circumstances.
 Proceeding from the general to the specific, we deem it
especially important here that, in the course of protracted
pretrial discovery, Faigin received voluminous documentary evidence
concerning Kelly's finances (e.g., tax returns, financial
statements, and balance sheets).  Parties sometimes can answer
interrogatories satisfactorily by reference to information
previously produced, see, e.g., Fed. R. Civ. P. 33(d), and the
district court apparently thought that this was so in the instant
case.  Given the differing institutional competencies of trial and
appellate tribunals, we decline to play Monday-morning quarterback
and substitute our collective judgement for that of the district
court.  See Mack, 871 F.2d at 187 (upholding the denial of motion
to compel further answers to interrogatories and noting that "above
all, the trier must be accorded considerable latitude in gauging
the extent of a party's compliance" with discovery requests); see
also id. ("Sticking the appellate nose too readily into the
district court's scope-of-discovery tent is . . . a recipe for
disaster.").
 If we had substantial doubts about this question   and we
do not   they would be quelled by Faigin's failure to request a
continuance.  Faigin claims to have been ambushed by the evidence
of some $800,000 in investment losses.  However, the most
efficacious remedy for litigatory surprise is to seek a continuance
at the time the surprise emerges.  See Jom, Inc. v. Adell Plastics,
Inc., 151 F.3d 15, 20 n.2 (1st Cir. 1998); Szeliga v. General
Motors Corp., 728 F.2d 566, 568 (1st Cir. 1984); see also United
States v. Diaz-Villafane, 874 F.2d 43, 47 (1st Cir. 1989)
(suggesting that if a party is confronted by unfair surprise, a
continuance usually provides "a complete cure").  If a party
eschews such a course, and then seeks to complain about unfair
surprise after he receives an unfavorable judgment or verdict, "his
neglect to ask the district court for a continuance to meet the
claimed exigency" undercuts his complaint.  Diaz-Villafane, 874
F.2d at 47.  In such circumstances, a reviewing court may attribute
special significance to the party's eschewal of a continuance and
assume that the party did not require additional time to adjust his
litigation strategy.  See United States v. Sepulveda, 15 F.3d 1161,
1178 (1st Cir. 1993).
 This case fits within that taxonomy.  Faigin does not
explain in any detail what portions of Kelly's loss computations
were not fully calculable from the materials already in his
possession.  This fact, coupled with the failure to seek a
continuance, disarms the complaint of unfair surprise.  See In re
United States, 158 F.3d 26, 32 n.3 (1st Cir. 1998).
                  G.  The Denial of Rebuttal.
 Faigin faults the district court for refusing to allow
him to present rebuttal testimony.  The principal objective of
rebuttal is to permit a litigant to counter new, unforeseen facts
brought out in the other side's case.  See  La Esperanza de P.R.,
Inc. v. Perez y Cia de P.R., Inc., 124 F.3d 10, 20 n.6 (1st Cir.
1997); Lubanski v. Coleco Indus., Inc., 929 F.2d 42, 47 (1st Cir.
1991).  The decision to allow or foreclose rebuttal evidence rests
squarely within the informed discretion of the district court.  See
United States v. LiCausi, 167 F.3d 36, 52 (1st Cir. 1999); see also
Fed. R. Evid. 611(a) (confirming the trial judge's authority over
the order of proof).
 Here, Faigin wanted rebuttal for two purposes.  First, he
wished to rebut the claim that Kelly had suffered investment losses
of roughly $800,000.  See supra Part II(F).  He proposed to do so
by eliciting testimony from an accounting expert that the
investments had yielded substantial tax benefits (which offset, at
least to some extent, their lack of economic success).  This
proffer was too late.  Faigin had the burden of proving that
Kelly's statements were false.  He knew that the statements'
truthfulness depended, at least in part, on the quality of the
investments.  He also knew through pretrial discovery  that this
aspect of the case would be hotly contested.  Indeed, Faigin called
Kelly during his case in chief and inquired pointedly about the
investment losses.  Faigin likewise pursued his "tax benefit"
theory during his case in chief.  Thus, Faigin had enough notice of
the dimensions of the battlefield that he could   and should   have
brought in his heavy artillery and called his expert prior to
resting.  He did not do so.
 In this setting, the district court did not abuse its
discretion in denying rebuttal.  When a party knows that a
contested matter is in the case, yet fails to address it in a
timely fashion, he scarcely can be heard to complain that the trial
court refused to give him a second nibble at the cherry.  See
Lubanski, 929 F.2d at 47 (upholding the denial of rebuttal when the
proffered rebuttal evidence was available to the plaintiff during
her case in chief and the testimony she sought to rebut was not
unexpected).  This principle has particular bite where, as here,
nothing new or unanticipated surfaced during the defense case that
even arguably changed the topography of the battlefield.
 Faigin's other basis for rebuttal is of a different
stripe.  He says that he desired to take the stand to rebut the
testimony of Ron Springs, a former client, and that the court erred
in not allowing rebuttal for this limited purpose.  Because this
plaint possesses a patina of plausibility, we recount the relevant
circumstances.
 Springs testified at the trial by way of a videotaped
deposition.  In anticipation of Kelly's introduction of this
evidence, Faigin's counsel sought to have Faigin testify during his
case in chief about inconsistent statements made by Springs.  The
court sustained Kelly's objection on the ground that Springs'
testimony had not yet been received.  At the same time, however,
the court told Faigin that he would be allowed to delve into those
statements on rebuttal.
 After the defense rested (presenting, inter alia,
Springs' deposition testimony), Faigin's counsel asked that Faigin
be permitted to take the stand "for ten minutes" in rebuttal and
referred obliquely to the court's earlier commitment.  The court
denied the request on the ground that, since Faigin had testified
for eight days, the testimony likely would be repetitive.  Faigin
neither made an offer of proof at that point nor identified the
particular statements that he wished to impeach.
 We conclude that Faigin's failure to make an appropriate
offer of proof eviscerates his claim.  See Fed. R. Evid. 103(a)(2)
(dictating that an assignment of error may not be predicated upon
a ruling that excludes evidence unless, inter alia, "the substance
of the evidence was made known to the court by offer or was
apparent from the context within which questions were asked").  
After all, "[i]t is a bedrock rule of trial practice that, to
preserve for appellate review a claim of error premised on the
exclusion of evidence, the aggrieved party must ensure that the
record sufficiently reflects the content of the proposed evidence."  
Williams, 146 F.3d at 49.  In this case, when the defense rested
and Faigin's counsel sought permission to call Faigin in rebuttal,
the court asked how he intended to rebut Kelly's witnesses.  The
lawyer merely restated the question:  "I'd like him to rebut the
charges made by those players in [Kelly's] case."  This falls
several leagues short of identifying the substance of the proposed
evidence.  See Earle v. Benoit, 850 F.2d 836, 848 (1st Cir. 1988).  
Since Faigin flouted a "bedrock rule," he must endure the penalty.
 Faigin attempts an end run around this seemingly
inevitable conclusion.  While admitting that he did not make a
contemporaneous offer of proof, he says that his attorney
adequately informed the court of the substance of the proposed
rebuttal more than three weeks earlier, when he prematurely sought
to have his client testify about Springs' statements.  Leaving the
time lag to one side, the record belies this claim.  It shows that
Faigin's lawyer mentioned the possibility of prior inconsistent
statements at that time, but did not elaborate in any way on the
nature of the purported inconsistencies.  Vague generalizations are
insufficient to effect compliance with Rule 103(a)(2).  See James
v. Bell Helicopter Co., 715 F.2d 166, 175 (5th Cir. 1983).
                     H.  Jury Instructions.
 Finally, Faigin strives to persuade us that the trial
court's jury instructions were thrice deficient.  The rules of
decision are uncontroversial.  "The trial court's refusal to give
a particular instruction constitutes reversible error only if the
requested instruction was (1) correct as a matter of substantive
law, (2) not substantially incorporated into the charge as
rendered, and (3) integral to an important point in the case."  
Elliott v. S.D. Warren Co., 134 F.3d 1, 6 (1st Cir. 1998) (quoting
United States v. DeStefano, 59 F.3d 1, 2 (1st Cir. 1995)).  
Similarly, the giving of an instruction is reversible error only if
it (1) was misleading, unduly complicating, or incorrect as a
matter of law, and (2) adversely affected the objecting party's
substantial rights.  See Levinsky's, Inc. v. Wal-Mart Stores, Inc.,
127 F.3d 122, 135 (1st Cir. 1997).   Applying these tenets, we
discern no error.
 First and foremost, we deem Faigin's challenge
procedurally defaulted.  A party cannot assign error to an aspect
of the judge's jury instructions unless that particular claim of
error has been noted by means of a contemporaneous objection given
at the appointed time (i.e., at the end of the charge, but before
the jury retires to deliberate).  See Campos-Orrego, 175 F.3d at
98; see also Fed. R. Civ. P. 51.  When put to his mettle, it is the
appellant's burden to establish that he has preserved such a claim
of error and, relatedly, to furnish the court of appeals with so
much of the record of the proceedings below as is necessary to
enable informed appellate review.  See Campos-Orrego, 175 F.3d at
93; Moore v. Murphy, 47 F.3d 8, 10 (1st Cir. 1995); see also Fed.
R. App. P. 10.  When an appellant dances around these
responsibilities, he must pay the piper.
 This is such a case.  Faigin failed to supply a
transcript of the Rule 51 sidebar conference.  This omission
obstructs our view of what transpired below.  We cannot tell what
specific objections, if any, were presented to the district court,
whether they were timely, or how the court responded.  Faigin's
failure to supply us with the raw material that would illuminate
these points supports a presumption that none of his challenges to
the jury instructions were properly preserved.
 We hasten to add that, even if Faigin's assaults on the
charge were appropriately before us, they would fail.  His initial
lament relates to the court's failure to instruct the jury that
defamation is a personal and individual claim.  Faigin presents no
independent argumentation in support of this attack, but, rather,
links it to his assertion that the court erred in admitting
evidence of what he terms "vicarious liability."  Because that
assertion lacks force, see supra Part II(E)(1), the linked claim of
instructional error collapses of its own weight.
 Faigin's next grievance pertains to an instruction given
by the court on the roles and duties of corporate officers,
directors, and attorneys.  He does not criticize the contents of
the instruction, but contends that the law of fiduciary duties was
immaterial in this case.  Because this claim hinges on his
unsuccessful challenge to the admission of "vicarious liability"
evidence and on his rejected "judicial estoppel" argument, see
supra Part II(E)(2), it, too, collapses.
 Faigin's final remonstrance concerns the trial court's
decision not to give an instruction on presumed damages.  But the
jury never reached the question of damages.  Hence, any error in
this regard necessarily was harmless.
III.  CONCLUSION
 We need go no further.  In law, as in football, the
number of passes attempted means less than the record of passes
completed and touchdowns scored.  Here, Faigin's passing attack,
though prolific, lacks accuracy, and, in all events, never crosses
the goal line.  For aught that appears, Faigin lost a hotly-
contested game played with scrupulous attention to the rules under
the watchful eyes of an attentive referee.  Because we descry no
trace of significant legal error, the district court's judgment
will be

Affirmed.

</body>

</html>