**William L. WILLIAMS,**
**Plaintiff, Appellee,**

v.

**Scott DRAKE and Fred Ford,**
**Defendants, Appellants.**

No. 98–1014.

United States Court of Appeals,
First Circuit.

Heard June 2, 1998.

Decided July 14, 1998.

Diane Sleek, Assistant Attorney General, State of Maine, with whom Andrew Ketterer, Attorney General, and Peter J. Brann, Assistant Attorney General, were on brief, for appellants.

Stuart W. Tisdale, Jr. for appellee.

Before SELYA and BOUDIN, Circuit Judges, and SCHWARZER,* Senior District Judge.

* Of the Northern District of California, sitting by designation.

SELYA, Circuit Judge.

Two correctional officers, Scott Drake and Francis ("Fred") Ford, appeal from an adverse jury verdict awarding damages to a former prison inmate. They claim that the lower court erroneously excluded relevant evidence and improperly retained a juror whose mental faculties were suspect. Finding none of their animadversions persuasive, we affirm.

## I. BACKGROUND

In 1994, plaintiff-appellee William L. Williams resided in the minimum security cellblock at the Maine Correctional Institute–Warren (MCI–Warren). Prison regulations afforded him a daily three-hour recreational period. Inmates can spend this interlude indoors (i.e., in the dayroom, where they can watch television and make telephone calls) or outdoors (i.e., in the yard—a paved area where they can play basketball or exercise).

For obvious reasons, correctional officers keep inmates under constant observation during the recreational period. If an inmate desires to move from the yard to the dayroom, he first must approach the control booth (a glassed-in enclosure that overlooks the yard) and request permission. If leave is granted, the supervising correctional officer opens a door that separates the yard from the dayroom. Once inside, the inmate must remain within the area demarcated by a yellow line and receive a correctional officer's permission before crossing the line for any reason.

On June 19, 1994, Williams proceeded from the cellblock through the dayroom and into the yard. He played basketball for a while. During a hiatus, he reentered the dayroom (the door to which temporarily had been left open). Because the water fountain was located beyond the yellow line, Williams sought and received permission to slake his thirst. As he repaired to the yard, Ford approached him and asked if he needed to see the nurse. Williams replied that he did not, but expressed curiosity as to why Ford had in-

quired. When he did not receive an answer, he returned to the basketball game.

Minutes later, the scrimmage ended and Williams decided to get another drink. The door to the dayroom was closed, so he sought and received permission to enter. Once inside, he again sought and received permission to cross the yellow line en route to the water fountain. After sipping his fill, Williams noticed Ford and another correctional officer standing directly behind him. Ford told Williams that he wanted to talk with him. Williams asked if the conversation could wait as his recreational period was limited and Ford could speak to him at any time.

On Williams's version of events,[1] Ford questioned his attitude, told him that his recreational period had ended, grabbed his arm, and began to lead him back to his cell. Williams jerked his arm away and an altercation erupted. Ford punched Williams in the face at least three times. Other correctional officers, including Drake, entered the fray. While Williams lay prostrate, the officers cuffed his hands and shackled his legs. Drake then knelt down, placed his hands around Williams's neck, squeezed, and asked: "Is this what you want? Have you had enough?" Drake's chokehold lasted no more than twenty seconds. Several officers then escorted Williams to new accommodations in MCI–Warren's high security section.

A disciplinary board (the Board), an internal body composed entirely of correctional officers, charged Williams administratively with inflicting bodily harm on Ford. Three days after the melee, the Board held a hearing, found Williams guilty, placed him in disciplinary segregation, and reduced his accumulated "good time" credits.

Invoking 42 U.S.C. § 1983 (1994), Williams subsequently filed an action in the United States District Court for the District of Maine. In it, he alleged that his constitutional rights had been flouted in a variety of ways. The parties agreed to proceed before a magistrate judge, see 28 U.S.C. § 636(c) (1994); Fed R. Civ. P. 73(b), who eventually

---

1. Not surprisingly, the officers' version differs somewhat. As the appellants do not challenge either the sufficiency or weight of the evidence, the differences are immaterial for purposes of this appeal.

narrowed the case to Williams's excessive force claim against Drake and Ford. A jury trial yielded identical verdicts against both correctional officers: $1 in actual damages and $15,000 in punitive damages. Following their unsuccessful pursuit of post-trial relief before the magistrate, Drake and Ford jointly prosecuted this appeal.

## II. ANALYSIS

We subdivide the appellants' challenge to the jury verdict into moieties involving, respectively, the disputed evidentiary rulings and the retention of the suspect juror.

### A. *The Evidentiary Rulings.*

■ The appellants assign error to three separate rulings excluding evidence. We test each ruling for abuse of discretion, *see Blinzler v. Marriott Int'l., Inc.,* 81 F.3d 1148, 1158 (1st Cir.1996); *Veranda Beach Club Ltd. Partnership v. Western Surety Co.,* 936 F.2d 1364, 1373 (1st Cir.1991), and then consider the appellants' cumulative-error plaint.

**1. *The Guilty Plea.*** Prior to trial, Williams filed a motion in limine to exclude evidence of a so-called guilty plea. The court granted the motion provisionally, subject to reexamination of the question at trial. *See, e.g., United States v. Holmquist,* 36 F.3d 154, 163–66 (1st Cir.1994) (describing this salutary practice). During defense counsel's cross-examination of Williams, she inquired about the plea, thus sparking a bench conference. We recount the relevant facts, consistent with the representations made to the court at that time.

When the Board charged Williams with inflicting bodily harm on Ford during the dayroom scuffle, Williams initially maintained his innocence. The Board found otherwise. Williams appealed to the warden, who granted a new hearing. A correctional officer delivered notification of this action to Williams at 6:45 a.m. on June 21, 1994. Williams claims to have been groggy due to the early hour and unaware that the notification concerned a *new* hearing. Convinced that further attempts to exonerate himself before decisionmakers whom he considered biased would be futile, he crossed out his previous "not guilty" plea and entered the word "guilty" on the form. As a result, no new hearing transpired.

Upon considering these facts, and hearing both lawyers at length, the magistrate reaffirmed his earlier ruling, sustained the plaintiff's objection to the pending question, and reminded counsel that such questions were prohibited. Significantly, the court did not preclude testimony concerning the disciplinary proceedings in gross, but  stated repeatedly that the defense could ask Williams about the nature of the hearing and about any statements that he made before the Board.

At the end of the plaintiff's case in chief, defense counsel made an adequate offer of proof as to what would have been asked and answered with regard to this guilty plea had she been given the opportunity to inquire. In rejecting this tender, the magistrate elaborated on his rationale for excluding the evidence. He reasoned that admitting the evidence would necessitate a trial within a trial, focusing too bright a spotlight on Williams's motivation for changing his plea. In the court's view, this detour would likely confuse the jurors and divert their attention from the issues committed to their discernment.

■ Fed R. Evid. 403 controls this point.[2] Trial courts have significant leeway in determining whether to admit or exclude evidence under the aegis of Rule 403. *See Daigle v. Maine Med. Ctr., Inc.,* 14 F.3d 684, 690 (1st Cir.1994). This latitudinarian approach dictates that "only rarely—and in extraordinary circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." *Freeman v. Package Mach. Co.,* 865 F.2d 1331, 1340 (1st Cir.1988). Viewed against this welcoming

---

**2.** The rule provides that:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Fed.R.Evid. 403.

backdrop, the court's exclusion of the guilty plea evidence passes muster.

■■■ The appellants harp on the demonstrable relevance of the guilty plea evidence. But this is only part of the picture. Rule 403 allows the exclusion of evidence which, though relevant, carries unwanted baggage, such as unfair prejudice or potential juror confusion. *See United States v. Fulmer*, 108 F.3d 1486, 1498 (1st Cir.1997); *United States v. Boylan*, 898 F.2d 230, 255–56 (1st Cir. 1990). Even an admission by a party opponent is subject to exclusion under Rule 403 if its potential for unfair prejudice overwhelms its probative worth. *See* 5 Jack B. Weinstein et al., *Weinstein's Federal Evidence* § 801.20[3], at 801–44 (2d ed.1998). The rule thus constitutes a tool that a trial judge can use to keep a jury's attention riveted on the dispositive issues.

In this instance, the magistrate had adequate reason to wield the tool. The probative value of the guilty plea evidence was limited; after all, the jury heard testimony anent the proceedings before the Board, and the circumstances surrounding the plea made Williams's explanation of how it came about plausible. Then, too, the potential for muddling the issues was real: the procedural and substantive differences between a prison disciplinary board hearing and a jury trial easily could have led to confusion. Moreover, delving into Williams's motivation for changing his plea could well have created an unwarranted sideshow, drawing attention from the main event. Equally as important, the proffered evidence contained the seeds of unfair prejudice. The jury might have been tempted to find against Williams solely on the basis that he admitted guilt to the Board, rather than focusing on the central (and substantially separate) issue of whether the appellants' use of force was appropriate under the circumstances.

This is not to say that the magistrate, in the exercise of his discretion, could not have admitted the evidence. But Rule 403 determinations, by their nature, are judgment calls—and on this occasion, the magistrate deemed exclusion the better course. Nor did he reach this conclusion casually: he approached the problem cautiously, deferring a final decision until the evidence appeared in full context; then, based on the guilty plea's relatively low probative value and its potential for breeding confusion, distraction, and undue prejudice, he rejected the proffer. Given this careful balancing, we cannot say that the trial court exceeded its wide discretion in deciding to exclude the evidence. *See Diaz v. Cianci*, 737 F.2d 138, 139 (1st Cir. 1984) (holding evidence of a plaintiff's conviction in a juvenile proceeding for assaulting officers excludable as prejudicial in a subsequent lawsuit).

**2. *MCI–Warren.*** During opening statements, defense counsel referred to Williams's home away from home as the "highest security prison in the State of Maine, housing the most dangerous prisoners in the State of Maine." Williams's counsel objected to this categorization and the magistrate sustained the objection.[3] During a subsequent bench conference, defense counsel asked for an explanation. The magistrate stated that he believed the reference was unduly prejudicial; labeling the security status of MCI–Warren and stereotyping its denizens could lead the jury to conclude that Williams must be a menace and, hence, that the officers' conduct during the dayroom incident was justified.

■■■ We find no abuse of discretion in the magistrate's ruling. As we already have observed, under Rule 403, potentially inflammatory evidence may be excluded if the danger of unfair prejudice substantially outweighs its probative value. *See United States v. Houlihan*, 92 F.3d 1271, 1282 n. 6 (1st Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 963, 136 L.Ed.2d 849 (1997). Describing MCI–Warren as a repository for Maine's most dangerous offenders tends to stereotype Williams.[4] As the magistrate explained,

---

**3.** Although the record is less than pellucid, the magistrate apparently warned the parties prior to trial not to use hyperbole in describing MCI–Warren. Defense counsel admitted as much, stating at sidebar that she realized the magistrate

"didn't want [the prison] to be referred to as 'Super–Max'."

**4.** Such stereotyping would have been particularly unfair in this instance, as the officials in

this portrayal could have wrought unfair prejudice by inducing the jury to turn aside Williams's lawsuit based on assumed character traits, rather than on competent evidence.

■ The propriety of this ruling is reinforced by the narrow crafting of the preclusion. Far from prohibiting all relevant testimony about security issues, the magistrate allowed the defense to introduce proof of MCI–Warren's security procedures and barred only the effort to affix a pejorative label on the facility and its occupants. A ruling that curbs rhetorical flourishes, but nonetheless allows the introduction of the substance underlying the disputed point, rarely will violate Rule 403. *See, e.g., Boylan,* 898 F.2d at 255–56. No such violation exists here.

3. *The Consequences of Indiscretion.* On Ford's redirect examination, his counsel sought to elicit testimony about the disciplinary consequences that might attend a correctional officer's unjustified striking of an inmate. Williams's lawyer objected successfully. The appellants assign error.

■ We do not need to dwell upon the speculative nature of the question (although that, in itself, might well be a valid ground for upholding the objection). It is a bedrock rule of trial practice that, to preserve for appellate review a claim of error premised on the exclusion of evidence, the aggrieved party must ensure that the record sufficiently reflects the content of the proposed evidence. Here, the appellants made no offer of proof as to what Ford's response would have been if permitted to answer the question. That omission is fatal. *See* Fed.R.Evid. 103(a)(2); *see also Cumpiano v. Banco Santander P.R.,* 902 F.2d 148, 157 n. 4 (1st Cir.1990); *McDonald v. Federal Labs., Inc.,* 724 F.2d 243, 248 (1st Cir.1984).

■ 4. *Cumulative Effect.* The appellants attempt to find strength in numbers by contending that the cumulative effect of the

disputed evidentiary rulings so tainted the proceedings as to require a new trial. The argument is no stranger to this court. *See, e.g., United States v. Sepulveda,* 15 F.3d 1161, 1195 (1st Cir.1993), *United States v. Dwyer,* 843 F.2d 60, 65 (1st Cir.1988). To deploy it successfully, however, a party must establish that individual miscues, while insufficient in themselves to warrant a new trial, have an aggregate effect that impugns the fairness of the proceedings and thus undermines the trustworthiness of the verdict. *See Sepulveda,* 15 F.3d at 1195–96. In other words, we will order a new trial on the basis of cumulative error only if multiple errors synergistically achieve "the critical mass necessary to cast a shadow upon the integrity of the verdict." *Id.* at 1196.

■ This principle is cold comfort to the appellants. As discussed *supra,* we find no error in the trial court's serial decisions to exclude the three pieces of evidence that the appellants wanted to introduce. Absent any particularized error, there can be no cumulative error. *See United States v. Stokes,* 124 F.3d 39, 43 (1st Cir.1997) (holding that "cumulative-error analysis is inappropriate when a party complains of the cumulative effect of non-errors"), *cert. denied,* ── U.S. ──, 118 S.Ct. 1103, 140 L.Ed.2d 156 (1998). Hence, this assignment of error collapses of its own weight.

### B. *The Loquacious Juror.*

During a recess on the first day of trial, a voluble juror struck up a conversation with a court attaché. The juror—whom we shall call by the *nom de guerre* "Smith"—recounted his recent jury service in an unrelated criminal case and confided that he had come to believe the accused might be involved in the celebrated murder of JonBenet Ramsey.[5] The attaché brought this remark to the magistrate's attention later that day and the magistrate promptly informed the lawyers. Defense counsel requested Smith's ouster,

---

charge of MCI–Warren had assigned Williams to a minimum security cellblock.

5. On December 26, 1996, six-year-old JonBenet Ramsey was found beaten and strangled to death in the basement of her Boulder, Colorado home. She had been a beauty contest winner, and her

death attracted nationwide attention. The case involved an array of unusual, highly suspicious circumstances. As of this date, the hunt for the murderer(s) remains very much in the public eye as no arrests have been made.

but Williams's attorney demurred. The magistrate declined to decommission the juror, noting that Smith's statement concerned a completely unrelated case.[6] The appellants protest this decision, claiming that Smith's continued jury service and his participation in the deliberations tainted the verdict because his comment conclusively evidenced his incompetence to make a rational judgment.

Fed R. Civ. P. 47(c) provides that a trial judge "may for good cause excuse a juror from service." We review the trial court's exercise (or non-exercise) of this authority for abuse of discretion. *See United States v. Gonzalez–Soberal*, 109 F.3d 64, 69 (1st Cir.1997). The magistrate's decision to permit Smith's continued service fell well within the ambit of this discretion.

We start with the obvious. Smith's remark does not evince any bias in Williams's favor or any prejudice against the appellants; indeed, as the magistrate observed, the comment has no bearing whatever on the case *sub judice*. Moreover, the comment does not call into legitimate question Smith's ability to decide the case at hand based solely on the evidence presented at trial. Under ordinary circumstances, then, it would not be error to retain the juror. *See id.* at 69–70; *United States v. Angiulo*, 897 F.2d 1169, 1185 (1st Cir.1990).

Of course, the appellants asseverate that the circumstances here are far from ordinary. Smith's statement, they maintain, is so bizarre that it makes manifest his incompetency to sit in judgment on any case. We accept the appellant's core premise: a person incapable of making rational judgments should not be permitted to serve on a trial jury if that disability is called to the judge's attention and a party seasonably requests the juror's removal. *See United States v. Walsh*, 75 F.3d 1, 4–5 (1st Cir.1996).

Having accepted this premise, however, we do not share the appellants' conclusion. The juror's remark, though peculiar, did not in and of itself evince an inability to form rational judgments, particularly since no meaningful context was afforded within which to evaluate the statement.[7] Consequently, it was not incumbent on the court to remove Smith from the panel. *See United States v. Vargas*, 606 F.2d 341, 345–46 (1st Cir.1979) (holding that, absent clear evidence of incompetency, trial court did not abuse its discretion by retaining juror); *cf. United States v. Corbin*, 590 F.2d 398, 400 (1st Cir.1979) (affirming juror's removal, but noting that removal was discretionary, not mandatory, when the suspect statement seemed "more a piece of eccentricity than a meaningful comment").

Our conclusion is fortified by the appellants' actions. Although Smith's statement sounds more than a bit farfetched, it cannot meaningfully be evaluated on this exiguous record—and the appellants did nothing either to fill this void or to create a record that might lend credence to their fears about Smith's rationality. A voir dire inquiry into a juror's fitness for continued service is often a useful testing device, *see, e.g., Thorpe v. Mutual of Omaha Ins. Co.*, 984 F.2d 541, 545 (1st Cir.1993), but the appellants at no time suggested such an inquiry. The challenged comment was not so plainly indicative of unfitness that it required the trial court, without more, to oust the juror, and the responsibility for requesting a more in-depth probe rested with the parties objecting to Smith's continued participation. *See United States v. Newman*, 982 F.2d 665, 669–70 (1st Cir.1992). In this type of situation, courts—like the Deity—are more prone to help those who help themselves.

We need go no further. We conclude that on this bareboned record the magistrate's decision that Smith was presumptively fit to continue serving as a juror in a civil case unrelated to the notorious murder to which

---

6. Although the trial transcript is silent on the magistrate's response to the removal request, the parties have filled the gap by stipulating to the substance of the magistrate's reply. We accept the stipulation. *See* Fed. R.App. P. 10(e) (providing that "if anything material to either party is omitted from the record by error or accident ...

the parties by stipulation ... may direct that the omission ... be corrected").

7. We do not know, for example, the details of the earlier criminal case, or what prompted Smith's suspicions.

his eccentric comment pertained was not an abuse of discretion.

*Affirmed.*