NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-186                                        Appeals Court

COLLEEN FYFFE  vs.  MASSACHUSETTS BAY TRANSPORTATION AUTHORITY &
                            another.[1]


No. 13-P-186.

Suffolk.     January 14, 2014. - October 6, 2014.

Present: Trainor, Graham, & Agnes, JJ.


Massachusetts Bay Transportation Authority.  Practice, Civil,
     Argument by counsel, Conduct of counsel, Opening statement,
     Instructions to jury, New trial.  Damages, Remittitur.



     Civil action commenced in the Superior Court Department on
May 11, 2010.

     The case was tried before Judith Fabricant, J., and a
motion for a new trial or remittitur was heard by her.


     John J. Bonistalli (Jonathan P. Feltner with him) for the
defendants.
     Thomas R. Murphy for the plaintiff.


     AGNES, J.  As we explain in detail below, this is a case

where, contrary to established law and the trial judge's

numerous cautions and rulings, plaintiff's experienced trial

---

     [1] Aiden Quinn.

counsel[2] improperly argued (1) facts that were not in evidence, (2) concepts of liability, despite the parties' stipulation that the only triable issues related to damages, and (3) that the jury were the conscience of the community and had a duty in this case to safeguard users of public transportation in the future. Plaintiff's counsel also wilfully disregarded the judge's explicit rulings on a number of issues and, by defiantly challenging her rulings in front of the jury, undermined her attempts to remedy his misconduct. As a result of these numerous transgressions by plaintiff's trial counsel, the judge was required to "conduct[] the trial under severe and exasperating handicaps." Stavisky v. Slotnik, 19 Mass. App. Ct. 1028, 1030 (1985). Mindful of the deference we owe the judge's determination on a motion for a new trial whether such errors were prejudicial, in this case our review of the record of this very brief trial (two full days of testimony) persuades us that the errors committed by plaintiff's counsel, considered in their totality, "injuriously affected the substantial rights" of the defendants and deprived them of a fair trial. G. L. c. 231, §§ 119, 132. Accordingly, despite the judge's commendable patience, we vacate the judgment and remand for a new trial.

Procedural background. The plaintiff Colleen Fyffe was injured on May 8, 2009, when the Massachusetts Bay

[2] Plaintiff's appellate counsel was not her trial counsel.

Transportation Authority (MBTA) trolley in which she was riding struck another trolley on the MBTA's Green Line in Boston. She filed suit in Superior Court against the MBTA and the operator of her trolley, Aiden Quinn, alleging that the defendants were liable in negligence. Before trial it was agreed that the plaintiff's trolley crashed due to the negligence of the operator.[3] The parties stipulated, and the trial judge instructed the jury, that the sole issue was the amount of money that would represent fair and reasonable compensation to the plaintiff for the injuries she suffered as a result of the defendants' negligence. Also as agreed, the jury were instructed that punitive damages were not part of the case before them. The verdict slip called for the jury to provide a single figure representing the total of all compensatory damages, with no breakdown of the damages components on which

---

[3] There was no direct evidence of what the operator was doing in the moments leading up to the crash. In a medical record that was read to the jury, there is a reference that the operator of the MBTA train was using a cellular telephone at the time of the collision. It certainly was a reasonable inference that the operator, defendant Quinn, was not paying attention to his driving. However, there was no evidence of "text messaging" following a voice message as argued by plaintiff's trial counsel. In any case, because liability was conceded by the defendants, the judge properly described plaintiff's trial counsel's references to the operator sending a text message just before the crash and to a "texting crash" in his opening statement and closing argument as having no probative value, but as "inflammatory."

they were instructed, such as medical expenses, lost earnings, and pain and suffering.

The jury returned a verdict awarding the plaintiff $1.228 million in damages. After the entry of judgment, the defendants timely filed a motion for a new trial or remittitur, asserting that the verdict was excessive and against the weight of the evidence; that as a result of deliberate and prejudicial misconduct by plaintiff's counsel the jurors were exposed to evidence not presented at trial; and that their verdict was reached under the influence of passion, sympathy, and prejudice. After a hearing, the trial judge issued a memorandum of decision and order denying the defendants' motion. The defendants appeal from both that order and the judgment.

Evidence at trial. The plaintiff presented evidence that she was forty-six years old at the time of the crash; that when the trolleys collided her neck snapped sharply backwards (her seat faced the rear of her train[4]); that she sustained cervical and lumbar spine injuries; that she incurred medical bills in the amount of $20,309.66; that she could not return to her job as a gate agent for Delta Airlines (Delta) because her injuries prevented the required regular lifting of heavy suitcases; that her 2008 Delta wages were $32,781; that if she worked full-time

---

[4] We use the terms "train" and "trolley" interchangeably, as nothing in this case turns on any distinction between the two.

for Delta, she could earn up to $40,000 annually plus benefits; and that in July of 2010 she began working in a restaurant where, in 2011, she worked two days per week, earning $15,479.

Although the defendants agreed with the plaintiff that the MBTA trolley operator was negligent, there were a number of issues they disputed at trial, including the severity and consequences of the plaintiff's neck injury; whether her lower back injury, chronic headaches, and depression and anxiety were preexisting conditions not caused or aggravated by the collision; the extent to which the plaintiff was disabled from working; and the adequacy of the proof of damages attributable to lost earning capacity.

In order to understand the significance of remarks made by plaintiff's counsel in his closing argument, it is necessary to set forth something of the testimony of the two medical experts. The plaintiff's expert, Dr. Francis Rockett, a neurosurgeon, first saw the plaintiff in December, 2010, about twenty months following the train crash.[5]  He did not review her medical records from before the May, 2009, crash.  Based on a magnetic resonance imaging (MRI) study of the plaintiff done in June,

---

[5] The plaintiff's medical records indicate that following the train crash, she treated with her primary care physician who referred her to a neurosurgeon, Dr. Duggan, who prescribed a course of physical therapy.

2009,[6] he opined that she had a herniated cervical disc. When asked, over defense objection, "what that herniated disc is doing," he not only stated it was "pushing against the spinal cord," but added if the "anterior spinal ligament," which protects the spinal cord "from further extrusion of the disc," did not remain intact, "it would render the patient quadriplegic."[7] After another objection to a follow-up question,

---

[6] The date of this examination is significant because there is evidence that following the train crash, the plaintiff participated in physical therapy and her condition improved substantially. There is also evidence that she reinjured herself in October, 2009. Once the plaintiff completed her initial course of physical therapy relating to her neck on November 3, 2009, she did not treat again until she saw Dr. Rockett in December, 2010. At that time he ordered a second MRI exam for the plaintiff which was limited to her lumbar spine. The plaintiff's first complaint of lower back pain was not until February, 2010, nine months after the train crash. Dr. Rockett recommended that she participate in physical therapy to strengthen the muscles in her back and abdomen. After a February 11, 2011, visit, Dr. Rockett saw the plaintiff again in December, 2011, and May, 2012. Although Dr. Rockett wrote two prescriptions for physical therapy, the plaintiff did not utilize the prescriptions.

[7] The testimony by Dr. Rockett on this point, in its entirety, was as follows:

> "I can show you what the disc image shows right here. And that's the static picture. But the thing is that the disc has protruded out through the ligament, which is herniated -- means it's herniated, and it's pushing against the spinal cord. At the same time it's lifting this anterior spinal ligament which in turn is protecting the cord from further extrusion of the disc, which if that took all of that disc material out and pushed it into the spinal cord, it would render the patient quadriplegic. So if that little thin ligament that's holding things together for

there was a sidebar conference. Counsel for the defendants pointed out that the subject of quadriplegia had not previously surfaced in any discovery. Plaintiff's counsel readily admitted that quadriplegia was "not in question."[8] The judge assumed and plaintiff's counsel readily acknowledged that the witness was not going to testify that the plaintiff was a quadriplegic. Dr. Rockett went on to explain that in March, 2012, he noted the plaintiff had reported pain radiating down her left arm to her left hand, and that this pain was the result of the pressure of the disc against the ligaments in the spinal canal. He added that the degree of the plaintiff's pain depended on the degree of pressure against those ligaments. He also opined that the plaintiff's complaints of low back pain first made about nine months after the trolley crash, and of headaches (which had also been a subject of complaints dating back to 2004), were related

_____

her, and as long as that is intact, her condition will be as we've observed."

Although this testimony was not immediately followed by an objection, defense counsel's earlier objection to the question, and his later sidebar statement that the reference by Dr. Rockett to quadriplegia was outside the scope of pretrial orders concerning the expert witness testimony, were sufficient to preserve the issue for appeal.

[8] There is no reference to quadriplegia in the pretrial discovery. In her supplemental answers to expert witness interrogatories, the plaintiff stated that it was the opinion of Dr. Rockett that she suffered "9% permanent impairment of the cervical spine, 15% impairment of the lumbar spine, and 23% whole person permanent impairment."

to that event. Dr. Rockett opined that the collision permanently disabled the plaintiff from her job as a Delta gate agent due to the requirement that such workers lift heavy pieces of luggage. Dr. Rockett did not opine that the plaintiff was permanently disabled from other types of employment that did not involve heavy lifting. See note 8, supra.

The jury also heard testimony by means of a videotaped deposition of Dr. Joseph D'Alton, a board certified neurologist called by the defendants. Dr. D'Alton did not treat or examine the plaintiff, but rendered opinions based on a review of the plaintiff's medical records. He agreed with Dr. Rockett that the June, 2009, MRI study of the plaintiff's neck revealed a disc herniation at C4-C5 that was caused by the trolley crash, but he described the injury far differently from Dr. Rockett.[9] Dr. D'Alton testified that in most such cases the extruded disc material is reabsorbed by the body and, with physical therapy, the symptoms go away within six to twelve weeks. In particular,

---

[9] Dr. D'Alton testified that he used the term "herniation" to describe the plaintiff's condition in June, 2009, because he uses that term whenever the disc capsule is breached and disc material is extruded (as opposed to a "disc bulge" or "disc protrusion," where there is no breach). However, he stated that there was no evidence that the nerve root or spinal cord was compressed. He added that the plaintiff's medical records contain reports that shortly after the train crash, she did not report any radiating pain down her arm or any sensation of numbness, which indicates that she did not suffer any nerve compression. He opined that the plaintiff's report to Dr. Rockett in May, 2012, of tingling in her hands was most likely an unrelated symptom of carpal tunnel syndrome.

he interpreted the plaintiff's medical records, especially the notes of her 2009 physical therapy treatment, as indicating that by November, 2009, she had improved considerably, had only mild pain, and was fit to return to work with limitations on lifting for about one month before she would be ready to resume her regular employment. He also opined that there was no causal relationship between the plaintiff's lower back problems and the train crash.

Discussion. 1. Introduction. The defendants contend that during the opening statement, throughout the presentation of the evidence, and during closing argument, plaintiff's counsel violated established rules of practice and evidentiary standards, frequently in direct violation of a ruling sustaining a defense objection. Observations made by the trial judge in her memorandum of decision indicate that she took the same view of the conduct of plaintiff's counsel, noting, for example, his "efforts to elicit evidence without any apparent good faith basis to believe that such evidence would be admissible." Although the judge responded to some of these violations by sustaining objections and giving instructions to the jury, we do not believe the actions taken by the judge cured the prejudice caused by counsel's misconduct.

2. Opening statement by plaintiff's counsel. "The proper function of an opening is to outline in a general way the nature

of the case which the counsel expects to be able to prove or support by evidence." Posell v. Herscovitz, 237 Mass. 513, 514 (1921). "It is not an opportunity for argument." Commonwealth v. Croken, 432 Mass. 266, 268 (2000). In his opening, plaintiff's counsel made multiple statements about the crash and the train operator's actions prior to and during the crash, despite the fact that the parties had stipulated that the defendants were negligent. For example, counsel told the jury that as the trolley left Government Center station and accelerated to full speed, defendant Quinn took out his cellular telephone and called his girlfriend, leaving a voice message. The judge sustained an objection and told counsel "to concentrate on the issue that is before the jury." Plaintiff's counsel responded by telling the jury that the operator then composed and sent a text message to his girlfriend as the train sped by yellow and red warning lights indicating a stopped train was ahead. Another objection was sustained, and again the judge instructed counsel, "let's move on to the issue that is before the jury." Plaintiff's counsel then described for the jury a scene in which the operator looked up from his telephone and saw the crash about to occur, despite the fact that there was no basis for counsel to believe there would be admissible evidence to support his statement. Despite several admonishments, plaintiff's counsel persisted in referring to facts that he had

no reasonable basis to expect would be proved by the evidence. Finally, the judge delivered a cautionary instruction to the jury.

However, plaintiff's counsel disregarded the judge's ruling and injected facts into the case that were prejudicial, not probative of the issues, and not supported by admissible evidence. For example, despite the judge's explicit caution during a bench conference that counsel not refer to facts that would not be supported by evidence, counsel continued, "At the crash people are thrown from their seats in the trains, against the walls and on to the floor. People are seen with contorted extremities, bleeding, necks are snapped, and --." Defense counsel objected again at this point, but the judge did not respond except by stating, "Counsel, again, you need to confine yourself to what you have reason to expect is going to come into evidence." Contrast Rivera v. Club Caravan, Inc., 77 Mass. App. Ct. 17, 21 (2010) (judge struck plaintiff's counsel's improper statement as to driver's blood alcohol level and instructed jury that they would not receive evidence on that subject, that the statement should not have been made, and that they should disregard it).

Unlike in A.C. Vaccaro, Inc. v. Vaccaro, 80 Mass. App. Ct. 635, 640-641 (2011), where there was one improper statement in the opening, in this case there were multiple improper

statements.  As in Goldstein v. Gontarz, 364 Mass. 800, 811-812 (1974), where an improper statement was the basis for ordering a new trial, here the improper statements were not probative and were made deliberately -- and in contravention of the judge's numerous directives to counsel to confine his statements to the evidence and to the issue at trial.

3.  Closing argument.  Prior to the closing arguments, the judge gave the jurors a comprehensive instruction explaining that closing arguments were not evidence and reminding them that they must rely on their own memory of the evidence.

In keeping with customary practice, defense counsel made the first closing argument, and suggested that the central question was what is fair and reasonable compensation for the injuries that the plaintiff suffered as a result of the trolley crash.  Defense counsel attempted to draw a distinction between fair compensation to the plaintiff for her injuries and a damage award that was intended to punish the defendants.  He discussed the plaintiff's medical records, and argued that the jury should credit the opinion of the defense medical expert who opined that the plaintiff's injuries due to the train collision were not as significant as she claimed and that some of her complaints were not related to the defendants' negligence.  Defense counsel also stressed that there was important evidence missing from the case -- in the sense that there was no evidence of how long the

plaintiff, then forty-nine years old, had planned to work -- to enable the jury to accurately calculate the value of the plaintiff's loss of earning capacity in the event the jury believed that she was no longer able to work.

Plaintiff's counsel, in stark contrast to the approach taken by defendants' counsel, chose not to follow established rules of conduct during his closing.  He told the jurors that not only were they required to answer the question submitted by the judge, but that each juror had a duty to explain to the other jurors the reason or reasons for deciding each issue in a particular way.  Defense counsel objected, but the judge deferred a ruling on the matter.  Plaintiff's counsel next not only argued that the defendants' apologies were "h[o]llow," but in direct violation of earlier rulings by the judge and settled principles of evidence law, he added that the defendants had failed to take corrective action to prevent such collisions from happening in the future.  See Mass. G. Evid. § 407(a) (2014) (evidence of subsequent remedial measures generally inadmissible).[10]  A defense objection was sustained, and the

---

[10] Plaintiff's counsel argued as follows:

"I want to take you back at the moment, right to the beginning of the trial, though, to the first thing that you heard from the MBTA and Aiden Quinn through their counsel.  It was an apology.  An apology that I suggest to you was h[o]llow, feigned apology.  And as my mother told me many times when I was young, did something I wasn't supposed to

judge told plaintiff's counsel to confine himself to the issue before the jury, but plaintiff's counsel followed immediately by telling the jurors that the defendants had forced the plaintiff to bring this lawsuit.  Another objection was lodged by defense counsel and sustained by the judge, who again instructed plaintiff's counsel to confine himself to the issue and the evidence.  Plaintiff's counsel responded by disagreeing with the judge's ruling and by repeating the suggestion that the MBTA had not taken responsibility for the plaintiff's injury.  Another objection was made by defense counsel, to which the judge responded by delivering a cautionary instruction.[11]

---

do, and then, 'Oh, I'm sorry,' she said, 'It's too little, too late.'  And that's what this apology is.  Too little, too late.  The question is:  What has the MBTA done to prevent this from happening again?"

See Mass. G. Evid. § 409(a) (2014) (generally, expressions of sympathy by a defendant for the injury suffered by a plaintiff are not admissible).

[11] The judge made these remarks to counsel and the jury:

"I'm going to interrupt you for just a moment, Counsel. Jurors, as I told you, the issue before you is to decide, based on the evidence that has been presented in this trial, to decide what amount of damages will fairly and adequately compensate the plaintiff for the injury suffered.  And I will be explaining to you the components of that injury.  The function of closing argument is to discuss the evidence that has been presented on that issue. That is the damages incurred by this plaintiff and the amount of money that would be fairly and adequately compensate this plaintiff for the damages that she has incurred.  So, Counsel, confine yourself to that issue, please."

Plaintiff's counsel responded to the judge's caution with a polite "[t]hank you, Your Honor," and, with his next breath, returned to his theme that the MBTA blamed the plaintiff and was not taking responsibility for her injuries: "What the MBTA has done in talking about the damages sustained by Colleen Fyffe, is to try to present to you a lack of responsibility. To try to blame Colleen Fyffe, blame other things going on in her life, and shed their responsibility and blame everything else. They've looked through every one of her drawers, looked into her cupboards, looked into her medical --[.]" Another objection was made by defense counsel, and again, the judge instructed plaintiff's counsel to confine himself to the evidence.

A few moments later, plaintiff's counsel returned to his theme that the MBTA sought to blame the plaintiff for her injuries, which led to another objection and another caution by the judge, who instructed plaintiff's counsel to finish and stated she would discuss the matter with counsel at sidebar after the argument.

Plaintiff's counsel then sailed into another theme by arguing that the jury should be aware that this was an "important coverage case," that there may be media coverage of it, and that it would be the first verdict after the train

crash.[12]  Following another objection, the judge gave yet another
cautionary instruction telling jurors to disregard any
consideration of media coverage.[13]

Plaintiff's counsel moved on to discuss his client's
injuries, limitations, and ongoing impairment for the next few
minutes of his closing.  He told the jury that all the doctors,
including the defendants' medical expert, Dr. D'Alton, agreed
that the plaintiff suffered a "severe injury."  Counsel then
made an unveiled reference to Dr. Rockett's testimony on the
possibility that the plaintiff could become a quadriplegic:

> "This herniated disc at C-4/5, which has left the disc
> space and entered into the spinal canal, impinging on our
> spinal cord, being held back from further damage to that
> spinal cord now by only a very thin fragile membrane.  That
> thin fragile membrane being the only thing that is
> preventing, or presently, at this moment, holding back the

---

[12] Plaintiff's counsel stated,

> "Now, your job in this case is a very important one.
> Again, as both the Court and myself indicated to you, it's
> a very important coverage case.  There could be media
> coverage on this case, and this is the first verdict.  Your
> verdict will be the first."

[13] The judge told the jurors,

> "Jurors, you will disregard any media coverage and any
> thought that there might be media coverage.  Your job here
> is to decide the facts of the damages incurred by this
> plaintiff and to decide the amount that will fairly and
> adequately compensate her for the damages she has suffered.
> It is of no significance whether there has been media
> coverage, whether there will be media coverage.  Put that
> entirely out of your mind.  Counsel, again, let's focus on
> the evidence, please."

further herniation of that disc into Colleen Fyffe's spinal
cord with the potential, with a risk that she lives with
every day of very, very grave consequences.  They don't
want to talk about that."

Defense counsel objected and the judge sustained the objection,

but plaintiff's counsel responded by arguing with the judge,

before the jury, that what he had said was "exactly what the

evidence was."  The judge again told plaintiff's counsel to

confine himself to the evidence of the damages suffered by the

plaintiff, and he responded, again before the jury, "that's

exactly what I'm talking about, Your Honor."  What then followed

was yet another attempt by plaintiff's counsel, in violation of

the judge's explicit prior rulings, to use the testimony of Dr.

Rockett to summon the image of his client as a person standing

on the precipice of quadriplegia:

"This damage that Colleen Fyffe suffered to her spinal
column, to this herniated disc is one that she lives with
every day.  She lives with not only the pain, not only the
function or loss, not only the effects on every part of her
life, but with the risk of the further harms that sit in
the background and will sit in the background for the rest
of her life.  And your determination on this case will be
the final determination.  Your verdict will be the only
verdict on this case.  Your verdict will be the verdict
forever.  Now, Colleen Fyffe's injury was -- is not static.
It is one as described by the medical evidence in the case,
by Dr. Rockett, as one that changes.  It changes all the
time and it changes in part based upon use.  The more
stress, strain, use that Colleen Fyffe placed on her neck,
it changes the disc.  She every day walks a tightrope of
whether or not there's going to be further injury from this
disc.  Whether or not this membrane that is holding the
disc back now from the spinal column is going to stay
there.  Whether it's going to hold."

Later, when plaintiff's counsel finally came to the issues of causation and the various components of her damages, he injected the following: "It was the MBTA's choice to save the money on a seat without a head restraint." There is no evidence in the case to support this remark, which was, in any event, irrelevant to the question before the jury. Defense counsel objected and once again the judge told plaintiff's counsel to confine himself to the issue of damages.

After some skirmishing over whether plaintiff's counsel should specify the amount of damages she was seeking, another remarkable exchange occurred that illustrates that plaintiff's counsel was acting in conscious disregard of the law as well as the judge's repeated instructions:

> Plaintiff's counsel: "On this case, you as this jury, as the jury in all cases that we do, is considered by the courts to be the conscience of the community. It is your job as the conscience of the community --"

> Defense counsel: "Objection, Your Honor."

> Plaintiff's counsel: "-- to determine --"

> The judge: "I'm going to be explaining to the jury their function. The only issue before the jury is the amount of the damages. Counsel, you've used up your time. Let's finish now."

> Plaintiff's counsel: "Okay. As this jury, you are the guardians of the safety of all of the moms, all of the dads, and all of the children, and all of the grandparents that ride in these trains. It is your --"

> Defense counsel: "Objection, Your Honor."

Plaintiff's counsel:  "-- decision --"

Defense counsel:  "Objection."

Plaintiff's counsel:  "-- that --"

Defense counsel:  "Move to strike any comment that --"

The judge:  "I'll address it.  Counsel, finish up, please."

Plaintiff's counsel:  "Thank you, Your Honor.  It is your decision that will make the determination as to what the responsibility is by the MBTA for the protection of these people, the paying passengers of its trains.  Thank you."

The judge:  "I'll see counsel at sidebar."

At sidebar,[14] the judge informed counsel that she would address the improprieties in the closing argument by instructing the jury (1) that their role was to fix the compensation due to the plaintiff and not to punish the defendants, (2) that a juror is not under any obligation to explain his or her thinking to the other jurors, and (3) that because liability was not an issue, they were not required to determine how the trolley had been operated, or the nature of the seat or other equipment.[15]

---

[14] As the sidebar conference began, an emphatic defense counsel made it clear that he was looking to the judge to take strong corrective action:  "I've been doing [closing arguments] for 37 years, and I've never heard anything as outrageous as that, Your Honor. . . .  [I]t is appalling how far outside what appropriate argument that was to the point of almost every time I stood up. . . ."  See Harlow v. Chin, 405 Mass. 697, 703 n.5 (1989) ("I've never heard an argument like that, and I hope I never hear one like it").

[15] The judge specifically rejected the argument by defense counsel that it was improper for plaintiff's counsel to suggest to the jury in closing argument that the plaintiff should be

However, she did not give any instructions on these matters at that time, instead moving on to the final jury charge.

In her final instructions, the judge addressed in direct fashion two aspects of the numerous acts of misconduct committed by plaintiff's trial counsel. First, she instructed the jury that "[t]he news media is entirely irrelevant to your task in this case. You should give no thought to how the news media, or anyone else, might report on your verdict or might react to you." Second, she told the jurors, "you don't have any sort of obligation to explain yourself to anyone. It can be helpful in the course of deliberation if, when you express a view, you explain why you hold that view, and sometimes if you give an explanation, you persuade other jurors. But you have no obligation in the course of your deliberations or at any other time to explain your views to anyone." However, beyond these instructions that related to specific errors by plaintiff's trial counsel, the judge did not specifically address his other

compensated $760,000 for loss of earning capacity solely on the basis of evidence that the plaintiff earned $40,000 per year prior to the train crash by assuming she would have worked until sixty-five years of age. The judge reasoned that jurors "can draw their own inference about how long she would have worked, and they can do arithmetic." When defense counsel argued that it was necessary to reduce such a calculation to its present value, the judge acknowledged that there was no expert testimony in the case on that question, but that the jury could use their common sense and common knowledge to arrive at the correct figure. In view of the result we reach, we need not address this issue.

misconduct, such as (1) referring to facts about the train crash that were not in evidence, (2) stating that the MBTA had tried to save money by installing a seat without a head rest, (3) stating that the MBTA had not corrected the problems that caused the plaintiff's injury, that the MBTA forced the plaintiff to bring the lawsuit, and that it subjected her to unfair scrutiny, (4) arguing that the medical evidence was that the plaintiff lived with the daily risk of becoming a quadriplegic, and (5) arguing that the jury "are the guardians of the safety of all of the moms, all of the dads, and all of the children, and all of the grandparents that ride in these trains."  Instead the judge relied upon standard language that compensatory damages are meant to remunerate the plaintiff, not punish the defendants; that the jurors were to decide the case based on the evidence; that the lawyers' arguments are not evidence; and that the jury had the right to believe or disbelieve the testimony of any witness, including the medical experts.[16]

---

[16] For example, the judge instructed the jury that "[t]he opening statements and the closing arguments of the lawyers are not evidence.  They're only intended to assist you in understanding the contentions of the parties."

The judge also instructed the jury,

"You are free to reject the testimony and opinion of [an expert] witness in whole or in part if you determine that the witness's opinion is not based on sufficient education and experience, or that the testimony of the witness was motivated by some bias or interest in the case.  You must

4.  The conduct of plaintiff's counsel caused prejudicial
error.  In her memorandum of decision on the defendants' motion
for a new trial or remittitur, the judge acknowledged that
plaintiff's counsel engaged in misconduct and that he lacked any
good faith basis for his actions.  The judge wrote:

> "The defendant[s] point[] to improprieties in the conduct
> of plaintiff's counsel, particularly during opening
> statement and closing argument, and suggest[] that
> counsel's conduct may have led the jury to act based on
> passion and prejudice rather than reason.  The Court agrees
> that plaintiff's counsel repeatedly exceeded well-
> established boundaries in both opening and closing, as well
> as in efforts to elicit evidence without any apparent good
> faith basis to believe that such evidence would be
> admissible."[17]

---

also, as I have explained, keep firmly in mind that you
alone decide what the facts are.  If you conclude that an
expert's opinion is not based on the facts as you find
those facts to be, then you may reject the testimony and
opinion of the expert in whole or in part.  You must
remember that expert witnesses do not decide cases.  Juries
do.  In the last analysis, an expert witness is like any
other witness in the sense that you alone make the judgment
about how much credibility and weight you give to the
expert's testimony, and what conclusions you draw from that
testimony."

[17] In a footnote, the judge was more specific:

"The most obvious example of efforts to elicit inadmissible
testimony is counsel's questioning of the plaintiff
regarding details of the conduct of the MBTA operator that
caused the collision, of which she had no personal
knowledge, and which had no relevance to damages, which was
the only issue before the jury.  Examples of improprieties
in closing argument include counsel's statements that
'there could be media coverage' of the jury verdict, and
that 'you are the guardians of the safety of all of the
moms . . . .'  Counsel is no novice, whose conduct might be
attributed to inexperience or inadvertence.  The Court can
only infer that counsel made a calculated choice to go as

However, the judge ultimately concluded that the curative instructions given to the jury sufficed to cure any prejudice to the defendants.

(i) Standard of review. The first question we must address is the standard of review. The plaintiff argues that our review on appeal from the denial of a motion for a new trial is limited to determining whether the judge abused her discretion. See Commonwealth v. Johnson Insulation, 425 Mass. 650, 668 (1997), citing Bartley v. Phillips, 317 Mass. 35, 41-43 (1944). We show great deference to the view taken by the trial judge in denying a new trial motion when the argument on appeal is based on the weight of the evidence, whether the damages awarded are excessive, or the impact of newly discovered evidence. See, e.g., Mirageas v. Massachusetts Bay Transp. Authy., 391 Mass. 815, 822 (1984); Robertson v. Gaston Snow & Ely Bartlett, 404 Mass. 515, 520, cert. denied, 493 U.S. 894 (1989); VanAlstyne v. Whalen, 15 Mass. App. Ct. 340, 349-350 (1983). However, this case is also before us on direct appeal from the judgment. Therefore, the deferential standard applicable to review of the new trial motion does not relieve us of the duty to examine the record to determine whether instructions that were given or not given by the judge when a

---

far he thought he could get away with."

matter was properly brought to her attention amounted to an error of law, and to assess whether the error was prejudicial.[18] See Hart v. Morris & Co., 259 Mass. 211, 214-215 (1927). Whether remedial instructions given during the trial in response to an objection that is sustained or at the conclusion of the trial during the judge's final charge are adequately curative

---

[18] The plaintiff does not argue on appeal that the defendants did not properly preserve for appellate review the errors committed by her trial counsel and the adequacy of the trial judge's response. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975); Mass.R.A.P. 16(b), as appearing in 411 Mass. 1602 (1992). The dissent nonetheless maintains that the defendants have "waived" the issue of prejudice resulting from the conduct of plaintiff's trial counsel. Post, at ____. Even if the plaintiff had raised the issue, there is an important distinction between a "waiver" and a "forfeiture." See Smith v. Kmart Corp., 177 F.3d 19, 25 (1st Cir. 1999) (explaining that by the "overwhelming weight of . . . authority," appellate courts are authorized to apply the plain error doctrine to remedy the consequences of egregious errors made in a closing argument though not properly preserved); Cadorna v. City and County of Denver, 245 F.R.D. 490, 495 (D. Colo. 2007) (waiver analysis not appropriate; court retains power to remedy unfair prejudice caused by improper conduct of counsel). See also Murphy v. International Robotic Sys., Inc., 766 So. 2d 1010, 1024-1026 (Fla. 2000) (collecting cases). There are Massachusetts cases along the same lines. See Michnik-Zilberman v. Gordon's Liquor, Inc., 390 Mass. 6, 9-10 (1983); Flood v. Southland Corp., 416 Mass. 62, 67-68 & nn.5-6 (1993); Hatton v. Meade, 23 Mass. App. Ct. 356, 362 (1987); Squibb v. R.M. Bradley & Co., 40 Mass. App. Ct. 914, 915 (1996).

Although a trial judge has discretion and at times a duty to act sua sponte to prevent and cure improper closing argument, see Commonwealth v. Olmande, 84 Mass. App. Ct. 231, 241 n.4 (2013) (Agnes, J., concurring), counsel also have an important role to play. Counsel not only should assist the judge by suggesting an appropriate curative instruction, but inform the judge why a curative instruction that is given is not adequate.

presents a question of law.  See Goldstein v. Gontarz, 364 Mass. at 811.

(ii)  Determining whether there was prejudicial error.  To properly assess the errors committed by plaintiff's trial counsel in this civil case, it is instructive to consider the framework that is used to evaluate allegations of misconduct by counsel in criminal cases, notwithstanding obvious differences in the review that takes place in criminal appeals.  We consider "(1) whether the defendant seasonably objected; (2) whether the error was limited to collateral issues or went to the heart of the case; (3) what specific or general instructions the judge gave to the jury which may have mitigated the mistake; and (4) whether the error, in the circumstances, possibly made a difference in the jury's conclusion."  Commonwealth v. Lewis, 465 Mass. 119, 130-131 (2013), quoting from Commonwealth v. Kater, 432 Mass. 404, 422-423 (2000).  See Commonwealth v. Kozec, 399 Mass. 514, 518 (1987).  The record here indicates that the defendants seasonably and repeatedly objected; that the misconduct by plaintiff's counsel related to the central issues in dispute; that although the judge responded to many of counsel's improper statements, the corrective measures taken were not sufficient to negate the prejudice; and that the cumulative effect of counsel's misconduct deprived the defendants of a fair trial.  In particular, on several occasions

during his closing argument, plaintiff's trial counsel challenged the judge in front of the jury as she instructed him to confine himself to the evidence.  We also attach significance to the fact that during his closing argument to the jury, plaintiff's trial counsel was permitted to state that in assessing fair compensation for her injuries, the jury should consider the possibility that at any time in the future, without warning, the plaintiff would become a quadriplegic because "a very thin fragile membrane," which was all that protected her spinal column from a herniated disc, could fail to hold the disc back from her spinal cord.  This was not within the realm of a reasonable inference from the medical evidence, and invited the jury to speculate about the central issue in the case -- fair compensation for the injury suffered by the plaintiff.

An isolated remark, even several remarks in a closing argument that make reference to matters that are not in evidence, when followed by an objection and a curative instruction directing jurors to disregard the remark, will not support an argument on appeal that there was prejudicial error requiring a new trial.  See, e.g., Haddad v. Wal-Mart Stores, Inc. (No. 1), 455 Mass. 91, 112 (2009).  While much is left to the discretion of the trial judge in assessing the impact of errors in a closing argument, see Gath v. M/A-Com, Inc., 440 Mass. 482, 495 (2003), this case stands apart from most cases in

which errors in a closing argument are alleged to require a new trial. In this case, in which the evidence unfolded over the course of only two days, the improper remarks permeated the opening and closing arguments, with plaintiff's experienced counsel deliberately disregarding the judge's directives and pretrial rulings, openly arguing with her, and defiantly, forcefully, and repeatedly making irrelevant and prejudicial statements.[19] We do not believe the judge's final charge was sufficient to counter the damage. See Goldstein v. Gontarz, 364 Mass. at 811. Defense counsel's numerous objections at trial, especially during plaintiff's counsel's closing argument, were sufficient to call the misconduct of opposing counsel to the judge's attention and to impose on her a duty to take corrective action. See Harlow v. Chin, 405 Mass. 697, 703 n.5 (1989); note 14, supra. While the trial judge was unfailingly patient and issued numerous cautions to plaintiff's trial counsel, the steps that were taken were not sufficient.

_____

[19] It is possible that even immediate curative actions would not have been sufficient to cure the prejudice. See Hess v. Boston Elev. Ry., 304 Mass. 535, 541 (1939). See also Krulewitch v. United States, 336 U.S. 440, 453 (1949) (Jackson, J., concurring). Plaintiff's counsel's open defiance was on display throughout the trial. For example, during the testimony of the plaintiff's former supervisor, when the judge instructed plaintiff's counsel that he could ask the witness about the requirements of the plaintiff's job, not about assumptions related to her physical condition, he responded: "I think with that restriction, Your Honor, I probably can't ask this witness the question that the jury would like answered."

Our conclusion as to unremedied prejudice finds support in the amount of the damages awarded by the jury. In denying the defendants' motion for a new trial or remittitur the judge reasoned in part that relief was unwarranted because the $1.228 million damages award was not disproportionate to the evidence. Although we are not prepared to say that the judge abused her discretion in denying remittitur,[20] we take the view that because the amount awarded seems to lie in the upper range of what may be borne by the evidence, it suggests a significant risk that the jury's assessment of damages was affected by the numerous improprieties of plaintiff's counsel.[21] Perhaps chief among

---

[20] On the other hand, based on the evidence, the judge was not foreclosed from taking the opposite course.

[21] We note here our misgivings about the judge's rough estimate that "the jury could fairly have assessed the value of the plaintiff's lost earnings and loss of earning capacity in an amount in the range of one million dollars." The judge based her calculation on what she took as the plaintiff's annual salary at Delta as a gate agent prior to the trolley crash ($40,000), added to it the plaintiff's estimate of the annual cost of obtaining the equivalent of the private health insurance she lost ($12,000), and multiplied the sum by twenty based on the assumption that the plaintiff would have continued working at that rate for another twenty years but for the injuries she suffered in the trolley crash. The evidence was that the plaintiff could earn up to $40,000, but does not permit the assumption that her wages at the time of the collision were in that amount. The evidence showed that working for Delta, the plaintiff earned $26,000 in 2006, $33,000 in 2007, and almost $33,000 in 2008. In 2009 before the crash, the plaintiff took advantage of a Delta furlough program, which permitted gate agents to take unpaid leaves of absence, as soon as the program became available. In fact, the plaintiff applied to extend her leave of absence beyond April, 2009, and was granted another

these is the argument by counsel that the plaintiff would live every remaining day of her life with the real possibility of becoming a quadriplegic, where there was no record evidence to support such speculation.

The judge reasoned in part that "the consequences of counsel's fault should not be visited on his client."  However, that is not the question before us.  Ultimately, the question before us is whether there was an unacceptable risk that plaintiff's counsel's misconduct had a material effect on the jury's decision.  Application of the prejudicial error standard under G. L. c. 231, §§ 119, 132, requires us to undertake a case-by-case analysis.  The substantial rights of a party are adversely affected when, "viewing the record in a commonsense way," the misconduct of a party or counsel "could have made a material difference" in the outcome.  DeJesus v. Yogel, 404 Mass. 44, 48 (1989).  Here, the jury were asked only to determine the cause, nature, and extent of the plaintiff's injuries and to assign to those attributable to the negligence

---

unpaid leave for May, 2009, prior to the collision.  The Delta representative could not explain other records indicating that the plaintiff was working during the first week of May, 2009. Moreover, putting aside whether there was any evidence that the plaintiff intended to work until age sixty-five, there was evidence that she could have worked in other capacities at Delta in the Boston area such as an outside sales representative, but that she arbitrarily decided she was unsuited for such work. Also, there was evidence that the plaintiff worked part-time as a hostess and that during 2011 she earned $15,000.

of the defendants a dollar value that would represent fair compensation to the plaintiff. We think that plaintiff's trial counsel's numerous inflammatory remarks and efforts to inject facts beyond the record into the trial, especially unfounded statements about the plaintiff's risk of future harm and the defendant MBTA's indifference to rider safety, could have influenced the jury's decision-making process, and thus deprived the defendants of a fair trial. The sheer number of counsel's acts of misconduct cannot be minimized or overlooked. See Williams v. Drake, 146 F.3d 44, 49 (1st Cir. 1998) ("[I]ndividual miscues, while insufficient in themselves to warrant a new trial, [may] have an aggregate effect that impugns the fairness of the proceedings and thus undermines the trustworthiness of the verdict"). See also Leone v. Doran, 363 Mass. 1, 6, S.C., 363 Mass. 886 (1973). Although the judge sustained numerous objections, told the jury that argument by the lawyers was not evidence, and gave jurors cautionary instructions about some of counsel's improper statements, the rubric that jurors are presumed to follow the judge's instructions does not mean that a curative or cautionary instruction always suffices to remove the stain of what otherwise would be prejudicial error. See Allen v. Boston Elev. Ry., 212 Mass. 191, 194 (1912).

        Conclusion.  It is instructive to consider the observation

made by the United States Court of Appeals for the First Circuit

in Polansky v. CNA Ins. Co., 852 F.2d 626, 632 (1st Cir. 1988):

> "[W]e do not view favorably any attempt 'to play fast and
> loose' with our judicial system.  Too often a lawyer loses
> sight of his primary responsibility as an officer of the
> court.  While he must provide 'zealous advocacy' for his
> client's cause, we encourage this only as a means of
> achieving the court's ultimate goal, which is finding the
> truth.  Deceptions, misrepresentations, or falsities can
> only frustrate that goal and will not be tolerated within
> our judicial system."  (Citations and footnote omitted.)

Ultimately, we conclude that the judge's efforts to address the

numerous and repeated violations of the law by plaintiff's trial

counsel fell short.  We cannot say "with substantial confidence"

that the errors committed by plaintiff's counsel did not make a

material difference in the outcome.  DeJesus v. Yogel, 404 Mass.

at 49.  Accordingly, we vacate the judgment and remand the case

for a new trial.[22]

                        So ordered.

---

[22] The plaintiff argues on appeal that she is entitled to
the costs of the action below.  We need not reach this issue, in
part because the plaintiff did not appeal from the judgment,
which omitted costs.  At any rate, the plaintiff is not entitled
to costs because she filed her action after November 1, 2009,
when the MBTA became a public employer and therefore immune from
the award of interest and costs accruing on or after that date.
Smith v. Massachusetts Bay Transp. Authy., 462 Mass. 370, 371,
380 (2012).

GRAHAM, J. (dissenting).  At trial, the sole issue for the jury was the amount of the plaintiff's damages.  The evidence presented by the plaintiff was as follows.  Dr. Francis Rockett, a neurosurgeon employed at the Newton-Wellesley Hospital, testified that the accident caused the plaintiff to suffer the herniation of the disc between her fourth and fifth cervical vertebrae.  The pressure of the disc against ligaments in her spine and a left-sided nerve root caused her to have pain in the affected areas when she engaged in various activities and prevented her from lifting heavy objects, performing yard work, or carrying large items.  Dr. Rockett opined that, as a result of the accident, the plaintiff was disabled permanently from her job as a Delta Airlines customer gate agent.

The plaintiff, a forty-six year old woman employed by Delta Airlines for twenty-three years at the time of the accident, had an annual salary at the time of the accident of approximately $40,000 per year, with annual raises of approximately four per cent available in each of the three years after the accident.[1]  In addition, the plaintiff received free travel benefits for herself and her family, paid vacation time, and ten paid holidays per year, together with medical insurance, life

_____

[1] Pursuant to Delta Airlines policy, if a gate attendant was not needed at the end of a shift, the attendant could leave work early and forfeit pay for the hours of work missed.  Before the train crash in 2009, the plaintiff at times took advantage of that policy, reducing her income somewhat as a result.

insurance, and pension benefits.  The medical benefits alone were worth more than $12,000 per year.

Both the plaintiff and her husband testified regarding the physical and emotional effects of the accident on the plaintiff. Each testified that the accident impaired the plaintiff's ability to participate in her previous activities and diminished her quality of life.

The defense relied on cross-examination of the plaintiff's witnesses, seeking to impeach their credibility.  In addition, the defense presented testimony, via videotape, from Dr. Joseph D'Alton, a doctor who had neither examined nor treated the plaintiff.  The trial was short and presented a classic case of credibility for the jury to determine.

While acknowledging the improprieties in the conduct of plaintiff's counsel, the judge, in light of her curative instructions, was "not persuaded that the jury's verdict reflects anything other than its permissible judgment of the credible evidence."  In rejecting the defendant's motion for new trial or remittitur, the judge determined that the jury could fairly have assessed the plaintiff's economic losses "in the range of one million dollars" and, in addition, "could properly have awarded a substantial additional amount for physical and emotional pain and suffering."

In my view, the motion judge, who was also the trial judge, did not abuse her considerable discretion in denying the motion. I would defer to her view. See Gath v. M/A-Com, Inc., 440 Mass. 482, 495 (2003) ("The judge was in the best position to evaluate the effect on the jury of the improper argument").

The majority of the court, hesitant (and properly so) to say outright that the judge abused her discretion, instead turns to the prejudicial error standard as its basis for overturning the judgment on the direct appeal. That analysis is flawed for several reasons. At the threshold, the defendants did not preserve for appeal their arguments about uncured prejudice from plaintiff's counsel's antics. Their contemporaneous objections alone were not enough: once the defendants' objections were sustained, they did not ask for specific curative instructions, and when the judge gave her own curative instructions, the defendants did not object or request any additional instructions or actions. Tellingly, at no time did defense counsel move for a mistrial. Finally, defense counsel did not object after the final jury charge was given, instead pronouncing himself satisfied. The issue of the sufficiency of the judge's instructions (or claimed insufficiency) has been waived. See Boston Edison Co. v. Massachusetts Water Resources Authy., 459 Mass. 724, 740 (2011), citing Mass.R.Civ.P. 51(b), 365 Mass. 816 (1974) (failure to object to the giving or omission of

instructions at trial waives right to claim error on appeal).[2]  I am concerned that the court, by relying on waived issues to upend a trial judge's discretionary determination in a civil case, has strayed too close to the restraining line between error correction and substitution of judgment.

Waiver of the issues aside, I am also persuaded that the majority has overestimated the prejudice caused by plaintiff's counsel's actions, inexcusable though they were.  A number of factors suggest an insignificant risk that the jury were inflamed or distracted.  (1)  The trial was clearly focused solely on the issue of damages -- the stipulation to liability was emphasized to the jury throughout the trial.  (2)  The vast majority of the evidence went in without objection or controversy, whereas the inadmissible evidence was only a small part and passed quickly.  (3)  Although there were opposing

---

[2] Similarly waived is any argument relying on the sufficiency of the evidence of damages.  The defendants neither moved for a directed verdict nor for judgment notwithstanding the verdict (judgment n.o.v.).  See Hatton v. Meade, 23 Mass. App. Ct. 356, 361 (1987) ("[W]here a losing party has not moved for a directed verdict at the close of all the evidence, [Mass.R.Civ.P. 50(b), 365 Mass. 814 (1974),] not only precludes [a] the granting to that party of a motion for judgment n.o.v., but also [b] appellate review of the sufficiency of the evidence to support the verdict").  The argument that there was insufficient evidence to support an award of lost earning capacity is therefore waived -- the judge told the parties that she would allow the jury to use their own common sense about how long the plaintiff would continue to work, and the defendants did not object.  Nor did they object when she told them that she would allow the jury to discount to present value in the absence of expert testimony on how to perform such a calculation.

experts, the plaintiff's expert testified live and the defendants' did not.  Testimony presented by video recording or transcript is often less effective than live testimony.  Moreover, the plaintiff's expert had personally examined the plaintiff, while the defendants' expert had not.  (4)  The husband's testimony was extremely affecting -- it painted a moving picture of a woman whose life activities have been seriously curtailed by the train crash.  A significant portion of the undifferentiated damages award may have related to this suffering.  (5)  The defendants' tactical decision to call the plaintiff's Delta Airlines supervisor to the stand clearly backfired.  His testimony favored the plaintiff, including vouching for her value as a long-time employee.  (6)  The trial judge allowed the jurors to ask questions after each witness's testimony and those questions reveal a focus only on pertinent issues.  (7)  The jury did not rush to a verdict.  They deliberated for one hour after the closings and returned to deliberate for almost a full additional day.  Considering that the trial was short, this was a long deliberation -- which undercuts the notion that the jury were inflamed by plaintiff's counsel.  (8)  Finally, I am inclined to believe that the judge's interventions with the jury had more curative value than the majority is willing to recognize.

I respectfully dissent.