*Couture v. Pallito*, 714-11-14 Wncv (Teachout, J., Jan. 25, 2018)
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

SUPERIOR COURT                                                    CIVIL DIVISION
Washington Unit                                        Docket No. 714-11-14 Wncv

DARREN COUTURE
    Plaintiff

    v.

ANDREW PALLITO, Commissioner, et al,
    Defendants

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

Plaintiff Darren Couture is a prisoner in the custody of the Defendant Commissioner of the Department of Corrections. He was previously on parole. His parole was revoked on May 6, 2014, and he filed this suit to challenge the parole revocation and reincarceration. Most claims were resolved in a summary judgment ruling dated February 26, 2016. The remaining claim for trial was whether his waiver of a revocation hearing and his admission to a violation of parole were made voluntarily.

Following a period of discovery and motions, the trial took place on January 18, 2018. Mr. Couture testified from the Newport prison by telephone, at his request, rather than being transported to court. He represented himself. Defendant was represented by Attorney Emily A. Carr.

Based on the evidence, the court makes the following findings of fact and conclusions of law.

### Findings of Fact

Mr. Couture is serving a sentence of 30 years to life for murder. It is unknown when he was sentenced, but it appears that as of the events of early 2014 he had already served 20 years. He has had longstanding mental health issues although the specifics are unknown except as described below. He testified that he has been on medication most of his life, and that medications have been prescribed for major depressive disorder, anxiety, and PTSD.

He was paroled in November of 2013. On December 16, 2013 he attempted suicide by carbon monoxide poisoning and spent time at the Brattleboro Retreat. At that time his parole officer was Chris Bilodeau. Brattleboro Retreat treatment notes (Exhibit C) for December 19, 2013 state that his symptoms "as he presents them meet full criteria for PTSD," and he was prescribed Zoloft for PTSD, melatonin for insomnia, and the plan included "will see if pt [patient] willing to consider Depakote for anger management."

Following his discharge from the Brattleboro Retreat, he apparently remained on parole. At some unknown date in December, Barbara Quilliam became his parole officer.

On March 20, 2014, he was arrested for a parole violation. The charge was for engaging in violent or threatening behavior,[1] which would be a violation of parole standard condition #5. He was appointed counsel, and a revocation hearing was scheduled for April 1, 2014. When he was booked into the prison at St. Albans, he was not placed into the general population. He was held in an observation cell in the booking area until the day of the hearing, April 1st. Scott Cookingham, a case worker at the St. Albans prison, acknowledged that Mr. Couture had "mental health issues" at the time he was booked into the prison.

The April 1 hearing before the Parole Board became a bail hearing and not a full revocation hearing. Mr. Couture was present with his attorney, Emily Tredeau. Also present, in addition to the Parole Board members, were Barbara Quilliam, Chris Bilodeau, Mr. Couture's sister, and "one other lady." Mr. Couture was not released. Immediately following the hearing, his sister communicated to a prison official that based on comments he had made, she was concerned that he might be suicidal. He had apparently stated that if he was not released on April 1st, he would starve himself. He was assessed for risk of suicide at 12:15 that day (Exhibit C). The recommendation/plan was to "Initiate Suicide Watch; Referral to Mental Health for followup."

Mr. Couture was placed that day in segregation "in a smock" in the Delta unit at the prison for his own safety due to his mental state.

On April 2, 2014, the next day, he underwent an "Initial Mental Health Evaluation" at the St. Albans prison (Exhibit C). The form shows past inpatient and outpatient mental health treatment, including involuntary hospitalization at Waterbury State Hospital in 1985, and a history of medication for depression, PTSD, and anxiety, including mood stabilizers and recent Depakote. It also states that he first attempted self-harm in November of 2013.[2] Apparently the results were determined to support the previous day's decision to put him in a smock in segregation on suicide watch, as he was kept there not only on April 2nd but for most of the rest of the month.

On the same day, two new charges of violation of parole were brought against him. These were for violation of parole conditions #2 and #20. According to Exhibit Q, condition #2 is "You shall abstain from the excessive use of alcoholic beverages." It appears that the #2 designation was a mistake, as attachments to the summary judgment motion show the condition intended was "You shall commit no act punishable under the law, including violations of court orders," which is #1. Nonetheless, the use of the label #2 continued throughout the process.

---

[1] February 26, 2016 Decision, page 3.

[2] From comparison of the entries on the April 1 and April 2 documents, it cannot be determined whether there were two separate suicide attempts, one in November and one in December of 2013, or whether there was one. The descriptions are cryptic and are different, but could refer to either a single incident or two.

Condition #20 is: "Your Supervising Parole Officer has the authority to restrict people you associate with."

At some point between late April and May 1, 2014, he was moved from the Delta segregation unit to general population. His testimony, which was unrefuted, was that the move was initiated by the mental health staff, who could only visit him once a week while he was in a smock in segregation in Delta, whereas they could visit him every day in general population to work with him on adjusting his medication, as the medication appropriate and available in prison was different from what he had been taking in the community. Once he was in the general population, he was assigned to the unit supervised by case worker Scott Cookingham.

On the morning of May 1, 2014, which was not long after he left segregation and suicide watch, he had a telephone conversation with his attorney. In it, he agreed to admit to one violation of conditions. He understood that the other two would be withdrawn.[3] He believed that the consequence would be that he would be getting out of prison on FSU (field supervision), and for him this was the critical reason that he agreed as it offered him the easy way to achieve his goal, which was release. In his testimony he did not explain the basis for this belief, but the court notes that in the State's summary judgment motion in Attachment E to the Affidavit of Sue Blair, the recommended consequence for violation of the two April 2 charges was "Recommend Mr. Couture's Parole be revoked and he serve a punitive sanction prior to being released on Conditional Reentry." Therefore, it was not unreasonable for him or his attorney to believe that such would be the consequence.

It is unknown what information he had about the specific facts on which the charges were based or what the evidence was to support the charges. The evidence is credible that at some point Mr. Couture had agreed that he would admit to having had contact with his estranged wife/girlfriend (exact relationship unknown), but he would not admit to any charge that involved his daughter; it is not known when he took that position in relation to any of the events described herein.

After the telephone conversation, on the same day, Parole Officer Quilliam received a phone call from his attorney informing her that Mr. Couture would admit to one count of violation without a hearing. She prepared a standard form "Vermont Parole Board Waiver of Parole/SCS Violation Hearing" (Exhibits 2 and M) by filling in his name and adding to it in handwriting the following: "Admit to Condition #20. Conditions #2 & 5 withdrawn." She faxed it to Scott Cookingham at the St. Albans prison. He printed it out and had Mr. Couture come to his office for signing.

---

[3] At the trial, no evidence was introduced showing what documents setting forth the charges and the facts were presented to Mr. Couture or on what date or under what circumstances. Mr. Couture does, however, acknowledge that he had seen all three charges before May 1, 2014, but it is not clear what he had seen.

Mr. Couture came to his office and was there for approximately 3–4 minutes. It is unknown whether he read the document or not. The content of the document is as follows:

> I *Darren Couture* waive my right to have a hearing before the Vermont Parole Board regarding my parole/SCS violation. I understand that by waiving this hearing I am not contesting my violation of parole/SCS, I recognize my right to counsel, and that I could be held without bail until the Parole Board has determined a disposition of this violation. I also understand that the disposition of this violation could include revocation of my parole/SCS. *Admit to Condition #20. Conditions #2 & 5 withdrawn.*[4]

Mr. Cookingham added the place, date, printed name of Mr. Couture, and his date of birth. They did not discuss the contents. Mr. Cookingham asked Mr. Couture if he was clear on what this meant "and he stated he knew that he would be required to participate in some kind of programming after they have the central level staffing . . . he is not happy about his [sic] but states he will do what needs to be done." Mr. Couture signed the document, and returned to general population. The document was not returned directly to Ms. Quilliam and it is not clear what happened to it, but the normal process is that such a document would be sent directly to the Parole Board.

The Parole Board met on May 6, 2014. The testimony and documentary evidence about who was there and what happened is contradictory.

Ms. Quilliam testified that she was present with witnesses, specifically the ex-wife/girlfriend, that Mr. Couture was there with his attorney, and that in addition another parole officer and Mr. Couture's sister were there. She testified that there were three Parole Board members present and that both the Board and his attorney "explained things" to Mr. Couture, and that he did not want to admit to anything related to his daughter and agreed that the waiver would stand.

Mr. Couture testified that he did not attend that hearing. He questioned whether Ms. Quilliam might have been confusing that hearing with the one that took place on April 1, as that is the hearing attended by Mr. Couture, his former parole officer, and his sister.[5] Mr. Couture notes that Exhibit Q is the Parole Board's own record documenting the hearing and it shows as present only two Board members (Chair George and Ozarowski), Attorney Tredeau, and Ms. Quilliam. Mr. Couture requested in discovery recordings of both the April 1 and May 6 meetings of the Parole Board, and there were apparently none.

---

[4] The italicized portion is the part handwritten by Ms. Quilliam.

[5] It is plausible that Ms. Quilliam would have brought witnesses to the April 1 hearing as it was originally scheduled to be a revocation hearing, and was later changed to a bail hearing. Mr. Couture testified that he never saw Ms. Trainor, the witness, at the hearing. It would be normal practice that fact witnesses for an evidentiary hearing would be in a side room and not enter the hearing room unless and until their testimony was needed.

In any event, it appears that the Waiver document was relied upon by the Board. Its hearing document (Exhibit Q) has check marks next to "Waived Hearing" and "Revocation." Condition #20 is circled. Under Comments is the entry: "Waived Hearing – Agreed to condition #20  withdrew others." DOC considers his parole revoked as of May 6, 2014.

From May 1 to May 15, Mr. Couture remained at the St. Albans prison and saw the mental health staff every day. They continued to work on adjusting his medication. On May 15th, he was transferred to the prison in Newport and mandated to meet with mental health in Newport the next day, May 16th. It was after he arrived in Newport that he learned from his caseworker that he would not be going out on FSU. He has been in prison in Newport since May 15, 2014. His case staffing took place in July of 2015.

From the time of his arrest and return to incarceration on March 20, 2014, he has been classified as SFI, meaning Seriously Functionally Impaired. This means that he is seen on a regular basis by a counselor, and meets with a clinical psychiatrist from central office by video on a periodic basis. The last time was approximately two weeks ago and concerned medication for anxiety related to the hearing.

The Commissioner's position is that the waiver of a revocation hearing and the admission to a violation of parole were voluntary as supported by the signed waiver document and the supporting testimony of Scott Cookingham, who witnessed Mr. Couture signing the document after conferring with his attorney and confirmed that he was "clear" about what it meant, and the testimony of Barbara Quilliam, who claims that Mr. Couture not only signed the document but appeared at a hearing in person on May 6, 2014 before the Parole Board and discussed it with the Board members and his attorney and affirmed that the waiver would stand.

Mr. Couture's position is that although he signed the document he did not voluntarily waive the opportunity for a hearing or admit to a violation because, due to his mental health issues, he impulsively jumped at the opportunity to take the "easy way out" (agreeing to admit to one count) because he believed that it was the path to be discharged on FSU.

It is bizarre that after all the motion practice and discovery in this case, there is such contradictory evidence about what occurred at the critical hearing—the May 6, 2014 Parole Board hearing at which the revocation decision was made—and that there is such a lack of evidence about concrete facts. Such evidence could have been presented at the hearing.[6]

The court finds it unnecessary to resolve the discrepancy between the two versions of what occurred, because under either version, the evidence does not support a finding that Mr. Couture's waiver of a hearing and admission to a violation were voluntary.

The document itself is not conclusive proof. It must be viewed in connection with the facts surrounding the events. Neither is Mr. Couture's argument that he only signed the

---

[6] It is noted that in the State's summary judgment motion, it did not mention the hearing except to state that Mr. Couture waived it. See Statement of Undisputed Fact #14 and supporting Blair Affidavit #14 and Attachment F, which is the same as Exhibit Q referenced above. The reasonable inference is that Mr. Couture waived attendance at the hearing.

document because he thought it meant he would get out on FSU. That is not by itself a valid basis for concluding that his decision to waive the hearing and admit a violation was not voluntary. The simple fact that a person believes that something will result from an action taken, where the something is not a specific condition, and it later does not happen, is not by itself a basis for determining that the decision and action were not voluntary.

It is the totality of the circumstances that shows that there is an insufficient basis upon which to find that the waiver and admission were voluntary.

As of May 1, 2014, Mr. Couture was a person with life-long mental health issues and medication treatment, including commitment for involuntary treatment. He

—had tried to commit suicide at least once 4–5 months earlier (Nov/Dec 2013),

—had been arrested and held in an observation cell for mental health reasons from March 20, 2014 to April 1, 2014,

—had expressed suicidal thoughts on April 1,

—had been assessed for suicide risk on April 2 and held in segregation in a smock on suicide watch for most of the full month of April,

—had received two additional charges for violating parole while he was on suicide watch, and

—had only spent a few days out of segregation in the general prison population, during which he was meeting with mental health professionals daily, who were in the process of adjusting his medication.

Under these circumstances, his mental health and ability to have rational understanding and make informed decisions would at least be something to explore and confirm before relying too heavily on a signed waiver document. There is no testimony about his mental state on May 1, 2014. His conversation with his attorney was by telephone, and there is no evidence about how long the conversation lasted or how extensive an analysis took place of the State's evidence for the charges against him. It was reasonable for him to take away from the conversation an expectation that admitting would result in FSU, as that was the recommendation in the supplement with the 2nd and 3rd charges against him. His encounter with the case worker was brief and involved no in-depth conversation.

He continued to meet with mental health professionals daily, not only between May 1 and May 6, but continuing on throughout his stay at St. Albans until May 15th, and then he met with mental health professionals at the Newport prison the next day, May 16th, immediately following his arrival there. Whether or not he had sufficient mental stability to make a voluntary waiver and admission on May 1 is questionable and cannot be determined based on the evidence available.

In addition, there is no evidence from which the court can determine what facts he was admitting to that constituted a violation of probation. All the record shows is that he admitted to

violating a condition that reads "Your Supervising Parole Officer has the authority to restrict people you associate with." From the evidence, one can infer (barely) that his Parole Officer had prohibited contact with his ex-wife/girlfriend and that he admitted contact with her, but the facts concerning the nature of the contact to which he was admitting are not part of the waiver/admit document and are not documented in the evidence, and yet the specific facts could have a huge impact on the nature of the possible consequences following revocation. One cannot actually tell what he admitted to, and it is not clear that he himself knew what he was agreeing to admit to on May 1st.

If he was not at the May 6, 2014 hearing, the Board never had the opportunity to review these issues with him, or to ascertain whether, due to his experiences over the previous several weeks, he was in a fit mental state to make a knowing and intelligent decision to give up a hearing at which the State would need to prove a violation and from which the consequences could be significant: the difference between being in and out of prison.

Even if he was at the hearing, as Ms. Quilliam claims, the State's evidence is not sufficient to show that the Parole Board took into account the then-current state of his mental status as a result of his condition during the previous weeks and sought assurance that he was in a fit mental state to make a waiver of hearing that resulted in an admission of a violation.

The Director of the Parole Board, Sue Blair, was apparently concerned about this. A little over a month after the hearing, on June 16, 2014, she emailed a message to Mr. Couture's attorney with the heading "Darren Couture request for PV info." She was questioning what documents Mr. Couture had seen and noted, "he agreed to waive the PV hearing, before seeing all the info?" (Exhibit N.) Although not entirely clear, the reasonable inference is that the Parole Board records showed that Mr. Couture had not attended the hearing. Whether he attended or not, she apparently had concerns that the Board had not done enough to establish a proper basis for revocation. Although she may have thereafter satisfied herself about that, the evidence presented at the hearing is not sufficient to do so.

The waiver document itself is not a sufficient basis for a finding that the decision to waive the hearing and admit a violation was voluntary, as it is just a piece of paper with a signature. The court has considered the State's evidence about the surrounding circumstances, but given *all* the surrounding circumstances, the evidence is not sufficient to show that: (a) if he did attend the hearing, the Board took into account his mental status and sought assurance that he was in a fit state to make a voluntary waiver and admission, or (b) if he did not attend the hearing, that at the time of signing he was in a fit state to make a voluntary waiver and admission.

## Conclusions of Law

Vermont's parole revocation statutes, 28 V.S.A. §§ 551–554, include no specific procedures relating to the voluntariness of an admission to a parole violation, or waiver of the revocation hearing. They merely refer generally to the "rules and regulations as the [parole] board may adopt." 28 V.S.A. § 552(b)(1).

The Parole Board's rules, as reflected in the Parole Board Manual, acknowledge that a parolee may waive the final hearing: "The parolee may waive the Final Parole Violation Hearing in writing. If the parolee waives, the matters proceed as if the Board had determined that the parolee had violated the terms and conditions of his or her parole." Parole Board Manual ch. 15, Procedures ¶ VI(C). Thus, under these rules, a waiver of the hearing automatically equates to an admission of a violation without clarification of specific facts. The Manual, however, nowhere addresses the issue of assurance of the voluntariness of a waiver.

As numerous courts have held, in the context of probation, parole, or other supervised/conditional release, constitutional due process concerns do not require a Rule 11-type colloquy to establish the voluntariness of an admission to a violation of conditions. See, e.g., *U.S. v. Pelensky*, 129 F.3d 63, 66–68 (2d Cir. 1997). However, while "formalistic procedures," *id*. at 68, are not required, "[t]his conclusion does not change the fact that a defendant's waiver must actually be knowing and voluntary," *id*. at 68 n.9; accord *State v. Hance*, 157 Vt. 222, 224 (1991) ("[W]e note that our decisions authorize a defendant to waive virtually any right, constitutional or statutory, as long as the waiver is knowing, intelligent, and voluntary."); *United States v. Correa-Torres*, 326 F.3d 18, 22 (1st Cir. 2003) ("As a general proposition . . . the waiver of virtually any right closely affecting individual liberty must be knowingly and voluntarily made.). A waiver is, after all, the "voluntary and intentional relinquishment of a known and enforceable right." *State v. Baker*, 2010 VT 109, ¶ 11, 189 Vt. 543.

A court reviewing a retrospective attack on the voluntariness of such a waiver should look to the details of any colloquy that occurred (if any), but also should assess the totality of the circumstances that reflects on voluntariness. *Correa-Torres*, 326 F.3d at 23. "The totality of the circumstances means exactly that—all the circumstances should be considered. . . . [H]owever, courts should beware of assigning talismanic significance to any single fact or circumstance." *Id*.; see also *State v. Constantini*, No. 2004-533, 2005 WL 6151339, at *3 (Vt. Nov. 2005) (unpub.) (evaluating the "totality of the circumstances" to determine voluntariness of waiver of counsel in probation revocation proceeding).

In this case, there is no evidence that the Parole Board, or any DOC or Parole Board officials, ever inquired into or sought to determine whether Mr. Couture's waiver of the final revocation hearing was knowing and voluntary. "While such an express finding is not ordinarily required in connection with a waiver of rights, it is infinitely more difficult to find a valid waiver based on a silent record." *Commonwealth v. Sayyid*, 17 N.E.3d 469, 477 (Mass. Ct. App. 2014) (quoting *Correa-Torres*, 326 F.3d at 23).

Given the fact that Mr. Couture had been isolated on suicide watch for several weeks shortly before signing the document, the basis for concern about voluntariness is palpable and, at a minimum, should have prompted some inquiry. Mr. Couture suffered from recognized mental illnesses, had been suicidal, and was receiving daily treatment for his mental health conditions. He had been segregated and dressed in a safety smock, which is intended to prevent an "acutely suicidal" inmate from fashioning his clothing into a noose. See DOC Directive #361.01.13(a). The DOC had designated him as SFI, which means, among other things, that it recognized that he has professionally diagnosed disorders "which substantially impair[] judgment, behavior,

capacity to recognize reality, or ability to meet the ordinary demands of life and which substantially impair[] the ability to function within the correctional setting." 28 V.S.A. § 906(1)(A). His conversation with his attorney prior to signing was by telephone and of unknown duration. At the time of seeing and signing the document, his attorney was not with him. It is unknown what he had seen about the charges against him.

The evidence does not show that either the Board or anyone else sought meaningful assurance that his waiver was knowing and voluntary. His case notes reflect only that his caseworker asked him if he was clear about waiving. His response was that he would have to do some programming after he was case staffed. That is all, and while it is sufficient to show what he thought would happen as a result, it is not sufficient to show that his mental state, given his experiences, was such that he had sufficient capacity to understand pertinent facts and options, evaluate them, and make a voluntary choice. Moreover, there is no evidence that his "waiver" was an admission to any particular conduct, nor is it clear that he knew what particular conduct he was accused of and what specifically could happen if he waived his final hearing. His signature on the waiver form was apparently given "talismanic significance."

For these and all the reasons cited in the Findings, the court cannot conclude that Mr. Couture's waiver was knowing and voluntary. It is vacated for that reason.

The court earlier explained that "[i]f Plaintiff succeeds in establishing that his waiver was not knowingly and voluntarily given, the case will be remanded to the Board to allow it to consider and adjudicate all of the violations originally brought against Plaintiff." Opinion and Order 8 (filed Feb. 26, 2016).

## Order

For the foregoing reasons, Mr. Couture's waiver of his final revocation hearing is vacated. This case is remanded to the Parole Board for asserted hearing on the charges against him.

Dated at Montpelier, Vermont this _____ day of January 2018.

_____
Mary Miles Teachout
Superior Court Judge

9